### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------------------ x
                                          :
In re                                     :    Chapter 11
                                          :
SEMCRUDE, L.P., et al.,                   :    Case No. 08-11525 (BLS)
                                          :
          Debtors.                        :    Jointly Administered
                                          :
------------------------------------------------------------------------ x
                                          :
BETTINA M. WHYTE, as the Trustee,         :
on behalf of the SemGroup Litigation Trust, :
                                          :
          Plaintiff,                      :    Adversary No. 10-50840-BLS
                                          :
     v.                                   :
                                          :
C/R ENERGY COINVESTMENT II, L.P., C/R     :
SEMGROUP INVESTMENT PARTNERSHIP, L.P.,    :
RITCHIE SG HOLDINGS LLC, SGLP HOLDING,    :
LTD., SGLP US HOLDING, LLC and DOE        :
DEFENDANTS, 1-100,                        :
                                          :
          Defendants.                     :
------------------------------------------------------------------------ x
BETTINA M. WHYTE, as the Trustee,         :
on behalf of the SemGroup Litigation Trust, :
                                          :
          Plaintiff,                      :
                                          :    Adversary No. 10-51808-BLS
     v.                                   :
                                          :
COTTONWOOD PARTNERSHIP, LLP,              :
ROSENE FAMILY, L.L.C.,                    :
SATCO INVESTMENTS, L.L.C., and            :
DOE DEFENDANTS, 1-100,                    :
                                          :
          Defendants.                     :
------------------------------------------------------------------------ x
```

### PLAINTIFF'S OPPOSITION TO
### DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

**BLANK ROME LLP**
Bonnie Glantz Fatell (No. 3809)
David A. Dorey (No. 5283)
1201 Market Street, Ste. 800
Wilmington, Delaware 19801
Telephone:  (302) 425-6400
Facsimile:  (302) 425-6464

**QUINN EMANUEL URQUHART**
  **& SULLIVAN, LLP**
R. Brian Timmons
Eric D. Winston
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

*Counsel for Plaintiff Bettina M. Whyte, Trustee*
*of the SemGroup Litigation Trust*

Dated:  March 8, 2013

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................1

NATURE AND STAGE OF PROCEEDINGS ...........................................................5

FACTUAL BACKGROUND .....................................................................................7

    A.    SemGroup's Businesses..................................................................7

    B.    SemGroup's Capital Structure and Credit Agreement.............................8

    C.    SemGroup's Representations With Respect to Its Commodities Trading Activities ................................................................10

    D.    SemGroup's Speculative/"Naked" Trading.........................................13

    E.    SemGroup's Liquidity Problems and Increasing Reliance on Borrowings Under the Credit Agreement to Fund Margin Deposits.........................15

    F.    SemGroup's Transactions with Westback ...........................................17

    G.    The Equity Distributions..................................................................20

    H.    July 2008 and SemGroup's Bankruptcy Filing...................................20

    I.    SemGroup's Lenders Would Have Cut Off SemGroup's Access to its Credit Facilities if they had known of Kivisto's Speculative Trading..................21

ARGUMENT ............................................................................................................22

I.    WHETHER SEMGROUP HAD UNREASONABLY SMALL CAPITAL AT THE TIME OF THE DISTRIBUTIONS TURNS ON DISPUTED QUESTIONS OF MATERIAL FACT..............................................................22

    A.    The Trustee's Theory of Unreasonably Small Capital is not Premised on Hindsight and is Valid as a Matter of Law ...........................................22

    B.    Whether SemGroup had Unreasonably Small Capital Turns on Disputed Questions of Material Fact.................................................................31

        1.    Whether the Lenders Erroneously Believed that SemGroup was not in Material Default of the Credit Agreement involves a Disputed Issue of Material Fact................................................................32

2.      Whether SemGroup was in Default under the Credit Agreement
        Involves a Disputed Issue of Material Fact.................................................35

3.      Whether SemGroup's Lenders Would have Cut Off its Access to
        Capital is a Disputed Issue of Material Fact ..............................................36

CONCLUSION.........................................................................................................................40

# TABLE OF AUTHORITIES

**Page**

## Cases

*ASARCO LLC v. Americas Mining Corp.*,
 396 B.R. 278 (S.D. Tex. 2008) ....................................................................22

*In re Adler, Coleman Clearing Corp.*,
 247 B.R. 51 (Bankr. S.D.N.Y. 1999), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001) ..........................27

*In re Coated Sales, Inc.*,
 144 B.R. 663 (Bankr. S.D.N.Y. 1992) ............................................................ *passim*

*Craycroft v. Carlton*,
 322 S.W.3d 587 (Mo. Ct. App. 2010) ...............................................................37

*Dickerson v. U.S. Steel Corp.*,
 439 F. Supp. 55 (E.D. Pa. 1977) ....................................................................39

*In re EBC I, Inc.*,
 380 B.R. 348 (Bankr. D. Del. 2008) ..............................................................22, 25

*In re Edgewater Medical Center*,
 373 B.R. 845 (N.D. Ill. 2007) ...................................................................30, 31

*Emerson v. Maples (In re Mark Benskin & Co., Inc.)*,
 161 B.R. 644 (Bankr. W.D. Tenn. 1993) ...............................................................26

*Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*,
 148 B.R. 97 (Bankr. D. Mass. 1992) ..............................................................25, 30

*In re Iridium Operating LLC*,
 373 B.R. 283 (Bankr. S.D.N.Y. 2007) ) (quoting *Coated Sales*, 144 B.R. at 668..................28

*Kipperman v. Onex Corp.*,
 411 B.R. 805 (N.D. Ga. 2009) .......................................................................25

*In re Mama D. Angelo, Inc.*,
 55 F.3d 552 (10th Cir. 1995) .......................................................................25

*Moody v. Security Pacific Business Credit, Inc.*,
 971 F.2d 1056 (3d Cir. 1992) ................................................................22, 23, 29

*Peltz v. Hatten*,
 279 B.R. 710 (D. Del. 2002), *aff'd sub nom. In re USN Communications, Inc.*, 60 F. App'x
 401 (3d Cir. 2003) ..................................................................................23

*In re Plassein Int'l Corp.*,
 03-11489 KG, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008) ............................22, 23, 25, 26

*In re Sanders*,
  110 B.R. 328 (M.D. Tenn. 1989) ........................................................................................37

*Teen-Ed, Inc. v. Kimball Int'l, Inc.*,
  620 F.2d 399 (3d Cir. 1980) ........................................................................................37, 38

*Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*,
  98 CIV. 3251  2000 WL 178278 (S.D.N.Y. Feb. 16, 2000) ........................................25

*In re W.R. Grace & Co.*,
  281 B.R. 852 (Bankr. D. Del. 2002) ...........................................................................25

*In re White*,
  167 B.R. 977 (Bankr. E.D. Okla. 1994) ........................................................................38

## **Statutes**

Fed. R. Civ. P. 30(b)(6) .................................................................................................33

Fed. R. Evid. 701 ...........................................................................................................37

Plaintiff Bettina M. Whyte ("Plaintiff" or "Trustee"), the duly appointed Trustee of the SemGroup Litigation Trust established pursuant to the "Fourth Amended Joint Plan of Affiliate Debtors Pursuant to Chapter 11 of the Bankruptcy Code," by and through her attorneys, respectfully submits this memorandum of law in opposition to the Defendants' Motions for Partial Summary Judgment (collectively, the "SJ Motion").[1]  This Opposition is supported by the "Declaration of Eric D. Winston" (the "Winston Decl.") and the "Declaration of Robert Valbona" (the "Valbona Decl.").

## **INTRODUCTION**

The Trustee seeks to recover from the Defendants two prepetition equity distributions, totaling $55,295,672.37, for which SemGroup L.P. received no value (the "Equity Distributions").  The Trustee contends that at the time of the Equity Distributions – August 2007 and February 2008 – SemGroup was insolvent and, independently, had unreasonably small capital.

The Defendants now seek partial summary judgment, solely with respect to the Trustee's unreasonably small capital claim.  The Defendants argue that the Trustee's unreasonably small capital claim fails as a matter of law because it is based on an improper hypothetical.

To the contrary, the Trustee's claim is based on actual facts that existed at the time of the two Equity Distributions.  Specifically, SemGroup's CEO, Thomas Kivisto ("Kivisto") was engaging in commodity trading activity at SemGroup that resulted in the impermissible sale of "naked" options – options not backed by SemGroup's physical inventory (or other offsetting trading positions) – something SemGroup's debt covenants specifically prohibited.  Defendants' own commodities trading expert has conceded that SemGroup's trading activity resulted in the sale of naked options *at the time of the Equity Distributions*.  *See* Ex. 9 (Feb. 28, 2013 Dep. of

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the SJ Motion.

Joseph Graham ("Graham Dep.") at 151:19-22 ("I agree that the strategy that they were engaged in resulted in positions that were greater than their physical assets, which by definition was they had naked positions on their books.")).  Separately, SemGroup was funneling tens of millions of dollars to Westback Purchasing Company, L.L.C. ("Westback"), a company owned by Kivisto, so that Kivisto could engage in personal commodities trading.  The funds were being advanced to Westback in the form of an interest free, unsecured loan from SemGroup, with no apparent limit and no terms of repayment.  SemGroup's credit agreement with its lenders specifically prohibited transactions with affiliates on non-arm's length terms, and Defendants have offered no evidence to contradict either the existence of the Westback related party transaction or its non-arm's length terms.  These facts were real, were occurring at the time of the Equity Distributions, and are virtually undisputed.

Although these facts were unknown by SemGroup's lenders, investors, and others at the time, that does not render them hypothetical facts – these facts existed.  Further, that the Westback related party transaction and sale of naked options were clear violations of SemGroup's credit agreement with its lenders is again not a matter of serious dispute.  The factual predicates for the Trustee's unreasonably small capital claims are real, not hypothetical, they occurred prior to and at the time of the two Equity Distributions, and Defendants have offered no evidence to the contrary.

Defendants seem to be suggesting that it is improper for the Court to consider how these extant facts would affect the adequacy of SemGroup's capital at the time of the Equity Distributions.  But this kind of inquiry is no different than the standard inquiry courts make in unreasonably small capital cases when they attempt to determine the reasonableness of a company's projections, based on all the facts and circumstances present at the time, including reasonably foreseeable future events.  Financial projections themselves, in essence, are a type of

hypothetical: they attempt to predict what might happen in the future based on certain assumptions.  In a case where continued operation of the company is heavily dependent on uninterrupted access to credit, the reasonableness of any set of projections would also necessarily include the expected future access to credit.  In the case of SemGroup, when factoring in the true factual realities that existed at the time of the Equity Distributions, any projections would have to discount to virtually 0% the probability of SemGroup's expected future uninterrupted access to capital.

The approach advocated by the Defendants instead would have the Court ignore the underlying factual reality that existed at the time, simply because those facts were not widely known outside of a handful of SemGroup's management.  Projections that ignore key underlying factual realities, even if known only to a small number of management, would seem to be unreasonable on their face, or at the very least, present material issues of fact.  Regardless of the factual realities present at the time of the Equity Distributions, Defendants urge this Court to evaluate the adequacy of SemGroup's capital based on the *subjective*, misinformed beliefs of those doing business with SemGroup at the time.  But courts evaluating unreasonably small capital claims reject such an approach, making it clear the reasonableness standard is an objective one.

The Defendants would also have this Court ignore the evidence of what SemGroup's lenders would have done under their Credit Agreement in light of the factual realities that existed at the time concerning SemGroup's trading activity and the terms of the Westback related party transaction.  As demonstrated by the numerous communications of SemGroup's lenders and evidence submitted by the corporate representative of the administrative agent bank in connection herewith, there is ample evidence to enable a reasonable trier of fact to find at trial that had SemGroup's lenders known of such defaults, they would not have waived those defaults,

3

would have terminated access to credit, and would not have permitted the Equity Distributions to occur.  At a minimum, there is sufficient evidence for this Court to determine that material issues of fact exist.

Courts have also held that in determining the reasonableness of capital, access to credit may be considered.  And the evidence is virtually undisputed that without additional uninterrupted credit, SemGroup could not continue to operate for more than a short period of time.  The Trustee also offers expert testimony from a banking expert with over 30 years of experience who will testify about what a reasonable banker would have done under the credit agreement when faced with the underlying factual realities.  Again, there is nothing inherently inadmissible in offering expert testimony in this regard and the Defendants' own expert has confirmed that even he plans to testify in this case about what "a reasonable credit officer" should have known or done.

> **Q**. But you believe you have sufficient expertise to testify about what the banks should have done in the case of SemGroup after having received the information that SemGroup provided to them, is that accurate?
>
> Mr. McLeenan:  Objection.  Misstates prior testimony.
>
> **A**. Based on the information provided to the banks, a reasonable credit officer could make certain assumptions.
>
> Q. And your opinions about what a reasonable credit officer would do are based on your prior experience of having worked at a bank?
>
> **A.** Prior experience of working at a bank and understanding what these reports mean.

Ex. 9 (Graham Dep. at 96:16-97:8).

Simply put, this Court should deny the SJ Motion and permit the parties to proceed to trial on the unreasonably small capital claim, just as the parties will be proceeding to trial on the Trustee's insolvency claim.

## NATURE AND STAGE OF PROCEEDINGS

On July 22, 2008 and October 17, 2008, SemGroup, L.P. and certain of its affiliates (collectively, "SemGroup") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On November 1, 2011, Plaintiff filed a second amended adversary complaint against the Ritchie Defendants (the "Ritchie Complaint").  [D.I. 77 (AP No. 10-50840)].  Also on November 1, 2011, Plaintiff filed a second amended complaint against Cottonwood (the "Cottonwood Complaint").  [D.I. 87 (AP No. 10-51808)].  Both the Ritchie Complaint and Cottonwood Complaint seek to recover, as constructive fraudulent transfers, partnership distributions that SemGroup and its general partner made to the named defendants pursuant to the Bankruptcy Code and Oklahoma state law.[2]

Over the last three years, the parties have engaged in extensive discovery, including producing millions of pages of documents, serving interrogatories and requests for admissions, and taking depositions.  The Trustee has produced reports of three experts:



---

[2]    Plaintiff initially sued sixteen recipients of the equity distributions, but over time has settled with all but the Ritchie Defendants and Cottonwood.

[3]    All exhibits, cited by exhibit numbers herein, are attached to the "Appendix of Exhibits" Plaintiff has filed herewith.  *See* Winston Decl.  Exhibits cited more than once will include a shorthand reference to the exhibit's name in addition to the exhibit number.  As agreed with Defendants, the exhibits have been filed under seal because they have been marked as confidential pursuant to the protective order entered in this proceeding. Portions of this memorandum that discuss information marked as confidential have also been filed under seal.

The Defendants have arranged for their own testifying experts.[4]

---

[4]    For purposes of this Opposition, the Trustee assumes the Defendants' experts are qualified and their opinions are admissible.  The Trustee reserves all rights to seek to exclude some or all of the opinions and testimony of the Defendants' proffered experts.

**FACTUAL BACKGROUND**

A.    **SemGroup's Businesses**

SemGroup was founded in February 2000 and, along with its affiliates, provided

gathering, transportation, storage, distribution, and other midstream services to crude oil

producers and refiners in North America.  *See* Decl. of Terrence Ronan in Supp. of Debtors'

Chapter 11 Petitions and Req. for First Day Relief ("Ronan Decl.") at ¶ 5 [D.I. 19 (Case No. 08-

11525)]; Ritchie Defs.' Answer to First Am. Compl. at ¶ 1 [D.I. 72 (AP No. 10-50840)];[5] *see*

*also* Disclosure Statement for Fourth Am. Joint Plan of Affiliated Debtors Pursuant to Chapter

11 of the Bankr. Code, dated Sept. 22, 2009 ("Disclosure Statement") at 34 [D.I. 5809 (Case No.

08-11525)].[6]

To the extent SemGroup engaged in trading activity, it was supposed to mitigate the

exposure of its physical inventory to the fluctuations in the commodities market, or to enhance

the value of its physical inventory by utilizing its physical assets to exploit inefficiencies in the

delivery markets.  In either case, however, SemGroup's trading purported to be tied to its

physical inventory or the oil and gas products it handled.  *See., e.g.,* Ex. 13 (2007 MD&A at 5).

As a midstream energy company, SemGroup was dependent on its ability to borrow

under credit facilities.  *See* SJ Motion at 6.  Moreover, to satisfy the margin requirements of its

---

[5]   The Ritchie Defendants incorporated their Answer to the First Amended Complaint as their answer to the
Second Amended Complaint. [D.I. 81 (AP No. 10-50840)].

[6]   Defendants' expert, Michael Lederman, stated that he did not believe there were any statements in the
disclosure statements that he believed were incorrect.  *See* Ex. 7 (Feb. 19, 2013 Dep. of Michael G. Lederman
("Lederman Dep.") at 47:6-15 ("**Q.** Okay. Sitting here today, do you recall whether there's any statements in the
disclosure statement that you think were not correct? — **A.** That one I can be a little more certain about.  No, I didn't
see anything in the disclosure statement that I thought was off.")).

trading activities, SemGroup needed continual access to substantial cash. *See* Ex. 1 (Reiss

Report at ¶¶ 24-27); Disclosure Statement at 60-61.

### B.    SemGroup's Capital Structure and Credit Agreement

Prior to both Equity Distribution dates, SemGroup was the guarantor of $2.1 billion of

debt under the Amended and Restated Credit Agreement, dated as of October 18, 2005 (as

amended from time to time, the "Credit Agreement"), which was comprised of three facilities

(collectively, the "Credit Facility"): (a) a working capital facility; (b) a revolving credit facility;

and (c) a $200 million term loan due March 16, 2011. *See* Ex. 10 (Credit Agreement);

Disclosure Statement at 58. SemGroup's obligations under the Credit Agreement were secured

by substantially all of SemGroup's assets. *See* Disclosure Statement at 58. Bank of America,

N.A. was a lender and acted as Administrative Agent under the Credit Agreement.[7]

The Credit Agreement contained a number of affirmative and negative covenants,

including provisions restricting the nature of SemGroup's trading activity and precluding

SemGroup from entering into related party transactions with affiliates on non-arms-length terms.

Section 7.13(a) prohibited any transaction that would violate SemGroup's Risk

Management Policy (the "RMP"), except where there was a good faith belief no such violation

had occurred and "remedied as promptly as possible . . . ." Ex. 10 (Credit Agreement at 123-24).

Under section 7.13(b) of the Credit Agreement, SemGroup was precluded from "permit[ting] to

exist any Position that does not have a 'back to back' offsetting Position in accordance with the

Risk Management Policy." *Id.* at 124.

SemGroup's RMP specifically prohibited the sale of naked options—options not backed

by physical inventory or an offsetting trading position, such as a futures contract. Ex. 11 (RMP

at 6-7 ("As a seller of options, SemGroup faces significant market risk. Therefore it is

---

[7]  Article IX of the Credit Agreement sets forth the rights and duties of the Administrative Agent. *See* Ex. 10
(Credit Agreement at 129-39).

SemGroup's policy not to sell naked options.") (emphasis in original)); *see also* Disclosure Statement at 63-64.

Independent of the RMP, section 7.13(c) of the Credit Agreement also stated that SemGroup cannot " . . . write (i.e. sell) any option, unless . . . such Loan Party has an Offsetting Position in Petroleum Inventory . . . ." Ex. 10 (Credit Agreement at 124).

Section 7.03(f) stated that SemGroup may incur obligations under Swap Contracts (as defined in the Credit Agreement) provided that such obligations were entered into in the ordinary course of business "for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, currency transaction or property held or reasonably anticipated to be held by such Person, or changes in the value of securities issued by such Person, *and not for purposes of speculation or taking a 'market view.'*" *Id.* at 117-18 (emphasis added).

Section 7.09 of the Credit Agreement prohibited SemGroup from entering into any transaction with an affiliate "other than on fair and reasonable terms substantially favorable" to SemGroup as would be obtainable by SemGroup "at the time in a comparable arm's length transaction" with a non-affiliate. *Id.* at 123.[8] Section 7.12 of the Credit Agreement prohibited SemGroup from making certain advances or loans "other than normal and prudent extensions of credit to customers buying goods and services in the ordinary course of business . . . ." *Id.*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[8]    Even with respect to third parties, section 7.12 limits SemGroup's ability to extend credit only to "normal and prudent extensions of credit customers buying goods and services in the ordinary course of business…which extensions shall not be for longer periods than those extended by similar businesses operated in a normal and prudent manner." *Id.*

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

Prior to both Equity Distribution dates, SemGroup also had approximately $593.8 million of unsecured notes (the "Notes") issued under an Indenture dated as of November 18, 2005 (as amended from time to time, the "Indenture").  *See* Ex. 12.  Section 4.17 of the Indenture prohibited SemGroup from engaging in any material business other than "Permitted Business," a defined term which requires SemGroup enter into "Hedging Obligations to support these businesses."  *Id.* at 18-19.  In turn, the Indenture defined "Hedging Obligations" as SemGroup's duty to "protect against fluctuations" in commodities and act "not for speculative purposes."  *Id.* at 12-13.  Similar to the Credit Agreement, the Indenture precluded SemGroup from entering into any transactions with affiliates "on terms that are not materially less favorable to [SemGroup] than those that would have been obtained in a comparable transaction by [SemGroup] with an unrelated Person."  *Id.* at 54-55.

### C.    SemGroup's Representations With Respect to Its Commodities Trading Activities

SemGroup's management consistently represented publicly that its trading was for hedging purposes and was backed by physical inventory and/or offsetting futures positions, and that SemGroup would not engage in speculative transactions like selling naked options.  ████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████



9  SemGroup's subsequently released Management's Discussion and Analysis of Financial Condition and Results of Operation (for the three months ended March 31, 2008 and 2007), repeats this representation verbatim. *See* Ex. 14 at 5.

11





**D.     SemGroup's Speculative/"Naked" Trading**

████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████

      And Cottonwood, in a complaint filed in Oklahoma against Kivisto and SemGroup's

auditor, asserted that:

> As early as 2005, Kivisto increasingly resorted to buying and selling 'naked options,' in part to cover for his unsuccessful trades. 'Naked options' are options that are not matched against physical inventory or an offsetting trading position. The fact that the options were not backed by physical inventory or offset by another open trade exposed SemGroup to significant risk, which only increased in 2006 and 2007.

Ex. 29 (*Cottonwood Partnership, LLP v. Pricewaterhouse Coopers, LLP*, Case No. 2010-08173,

Petition dated Dec. 22, 2010 ("Cottonwood Petition") at ¶ 53). Cottonwood made similar

assertions in several pleadings, including briefs filed in this Court. *See* Cottonwood's Objection

to Kivisto's Mot. to Enforce, at ¶ 3 [D.I. 8861 (Case No. 08-11525)] ("Kivisto also was

responsible for SemGroup's highly risky and costly energy options trading program, which

ultimately contributed to SemGroup's collapse into bankruptcy by rendering the company unable

to finance its operations.").

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██ ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

Louis J. Freeh, the Bankruptcy Court appointed examiner (the "Examiner") in SemGroup's chapter 11 case, also concluded that "SemGroup . . . engaged in some 'naked options' transactions (which included the sale of naked call and put options)."  Final Report of Louis J. Freeh, Bankruptcy Court Examiner ("Examiner's Report") at 10 [D.I. 3701 (AP No. 10-51808)].  SemGroup's internal emails confirm Freeh's findings. ███████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

### E.     SemGroup's Liquidity Problems and Increasing Reliance on Borrowings Under the Credit Agreement to Fund Margin Deposits

Between July 2007 and February 2008, SemGroup's debt obligations increased by more than $1 billion due to, among other things, SemGroup's increase in borrowing under the Credit Agreement.  *See* Ex. 1 (Reiss Report at ¶ 46).  For example, as of July 2007, SemGroup had

---

████████████████████████████████████████████████████████

$710 million of debt outstanding on its working capital facility and $108 million outstanding on its revolving credit facility, but as of February 2008, those amounts increased to $1.328 billion and $400 million respectively. *Compare* Ex. 33 (Condensed Consol. Fin. Statements (Unaudited), as of July 31, 2007 at 16), *with* Ex. 34 (Condensed Consol. Fin. Statements (Unaudited), as of Feb 29, 2008 at 13).



**F.    SemGroup's Transactions with Westback**

In addition to Kivisto's unauthorized trading activity, SemGroup's relationship with Westback further distorted SemGroup's financial condition.  Westback was, at all relevant times, wholly owned by SemGroup's Chief Executive Officer Tom Kivisto and his wife Julie L. Kivisto.  *See* Examiner's Report at 103; *see also* Ex. 38 (R_SEM_LT 0072610).   SemGroup funded Westback's trading activities by having Eaglwing L.P. (a subsidiary of SemGroup)

purchase derivatives and post margin for Westback's account.  *See* Examiner's Report at 11.[12]

Neither SemGroup nor Eaglwing L.P. charged Westback any interest for the advances of credit

made to fund Westback's trading.  *See* Ex. 29 (Cottonwood Petition at ¶ 41 ("The [SemGroup

financial statement's Related Party] disclosure omits the fact that SemGroup received no security

or collateral to ensure repayment [a]nd the disclosure further omits that SemGroup did not

charge interests on the amounts advanced or a financing fee.")).

Further, there were no terms of payment, no limit on the amounts that could be advanced

on Westback's behalf, no granting of collateral to secure Westback's obligations, nor any

agreement memorializing the extensions of credit.  *See* Examiner's Report at 117-118; *see also

id.* at Examiner's Report Ex. 40 (Mar. 20, 2006 Memorandum from Eaglwing to Kivisto re:

Westback) [D.I. 3704 (AP No. 10-51808)].  Indeed, it appears that SemGroup's treatment of its

relationship with Westback was entirely inconsistent with how it typically worked with

customers – normally SemGroup's credit risk department would carefully analyze the credit of

counterparties,[13] but it does not appear that any such evaluation occurred in the case of

Westback.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

---

[12]   *See also* Ex. 29 (Cottonwood Petition at ¶ 32 ("[T]rades were made for Kivisto's personal benefit through the account of Eaglwing, a SemGroup business unit[, and] SemGroup essentially 'fronted' the margins and margin call requirements for Kivisto's personal Westback options trades using Eaglwing.").
[13]   ████████████████████████████████████████████████████████████
███████████████████████████████████████████████

18

[REDACTED]

SemGroup's creditors and counterparties, including the lenders under the Credit Agreement, Cottonwood, and even certain members of SemGroup's general partner's management committee, were unaware of SemGroup's relationship with Westback.  For example:

- a representative of Calyon, one of the lenders under the Credit Agreement and a trading counterparty with SemGroup, stated that he first remembered "hearing about Westback during a bankers' conference call with SemGroup on July 15 or 16, 2008."  Examiner Report at 140;

- SemGroup Management Committee member Thane Ritchie (of the Ritchie Defendants) "stated that he first heard of Westback in mid-July 2008, during the week preceding the Debtors' bankruptcy filings, when Ritchie was on a conference call led by a Blackstone representative."  *Id.* at 131;

- Similarly, Andrew Ward, who like Mr. Ritchie served on the Management Committee of SemGroup, "stated that he was unaware of the Westback receivable until days prior to the filing of the Debtors' bankruptcy petitions . . . ."  *Id.* at 132; and

- ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

### G.    The Equity Distributions

The Ritchie Defendants received $23,389,807.65 in Equity Distributions on August 2, 2007 and $25,988,675.17 in Equity Distributions on February 20, 2008.  *See* SJ Motion at 11. Cottonwood also received Equity Distributions on or around the same dates, totaling $2,802,879.27 in August 2007 and $3,114,310.28 in February 2008.  *See* Cottonwood Complaint at ¶ 78 [D.I. 87 (AP No. 10-51808)].

### H.    July 2008 and SemGroup's Bankruptcy Filing

In early July 2008, in face of ever increasing volatility and price increases in the energy market, SemGroup could no longer sustain its high risk trading activity.  And because so many of SemGroup's trading positions were not backed by its physical inventory or offset by another position (e.g. a futures contract), SemGroup could not simply liquidate its positions by settling with physical delivery.  It was facing staggering unrealized losses.  As a result, SemGroup novated its NYMEX trading book to Barclays on July 15, 2008, paying Barclays $143 million and causing SemGroup to realize nearly $2.4 billion in previously unrealized trading losses.  *See* Disclosure Statement at 35.  SemGroup was also carrying approximately $850 million in trading losses on its over-the-counter trading book at the same time.  *See id.*

During a series of conference calls held in the days immediately preceding the bankruptcy, restructuring professionals engaged by SemGroup informed the lenders that Kivisto's traders had been engaged in speculative trading and that Kivisto was using the banks' money "for side trading in a parallel book (Westback), and that he owed $300 million to SemGroup."  Examiner's Report at 208.  ████████████████████████████████

███████████████████████████████████████████████████

███████████████ Shortly thereafter, on July 22, 2008, SemGroup filed bankruptcy.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

I.      SemGroup's Lenders Would Have Cut Off SemGroup's Access to its Credit
        Facilities if they had known of Kivisto's Speculative Trading

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

---

[14]  A day earlier, on July 14, 2008, Bank of America told Terry Ronan that SemGroup was in default under its Credit Agreement after Ronan informed the bank that it had novated its NYMEX trading book to Barclays.  *See* Examiner's Report at 207-08; ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

## ARGUMENT

I.  **WHETHER SEMGROUP HAD UNREASONABLY SMALL CAPITAL AT THE TIME OF THE DISTRIBUTIONS TURNS ON DISPUTED QUESTIONS OF MATERIAL FACT**

   A.  **The Trustee's Theory of Unreasonably Small Capital is not Premised on Hindsight and is Valid as a Matter of Law**

Unreasonably small capital is a financial condition conceptually distinct from, and short of, insolvency.  It concerns the inability of a company, at the time of the challenged transfer, to generate or have reliable access to sufficient cash to fund its ongoing operations.  *See In re EBC I, Inc.*, 380 B.R. 348, 359 (Bankr. D. Del. 2008) ("[T]he unreasonably small capital test . . . analyzes whether at the time of the transfer the company had insufficient capital, including access to credit for operations.").  As the Third Circuit described in *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992), unreasonably small capital refers to "to the inability to generate sufficient profits to sustain operations." *Id.* at 1070.

The typical lynchpin of an unreasonably small capital test is a company's projections and whether those projections (1) are reasonable and (2) show that the company has sufficient capital going forward.  *Id.* at 1073; *In re Plassein Int'l Corp.*, 03-11489 KG, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008) ("In order to determine whether a firm has unreasonably small capital, courts must make an objective assessment of the companies' financial projections."); *see also ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 397 (S.D. Tex. 2008) ("The test for unreasonably small assets is 'reasonable foreseeability.'  This determination requires an objective assessment of the company's financial projections – the critical question being whether

those projections were reasonable."). The projections' reasonableness "must be tested by an objective standard anchored in the company's *actual performance*." *Moody*, 971 F.2d 1073 (emphasis added). The projections take into account cash flow, net sales, gross profit margins, and net profits and losses. *Id.*

Projections are, by their very nature, based on hypotheticals and assumptions about how a company is expected to perform in the future. In *Moody*, the Third Circuit noted that "reliance on historical data alone is not enough," the parties should account for available sources of liquidity, and that and the "parties must also account for difficulties that are likely to arise . . . ." *Id.*

Further, a court in this District noted that a determination of whether a company had unreasonably small capital is fact intensive in nature and generally not appropriate for summary judgment. *See Plassein*, 2008 WL 1990315 at *26-27, 30 (holding that "summary judgment [was] not appropriate" where plaintiff had demonstrated facts and provided expert testimony to show that debtor's management's projections were not prudent and that the company had unreasonably small capital).

Defendants assert that "SemGroup had no reason to foresee at the time of the Distributions that its lenders had any objections with SemGroup's options trading that might cause the lenders to cut off credit to it." SJ Motion at 19 n.12. But that is a disputed issue of fact, and thus is not appropriate for summary judgment, because it is at least a disputed fact whether SemGroup's management would have reason to foresee the lenders having objections if they knew of the sale of naked options in violation of the RMP and the Credit Agreement. Moreover, Defendants assume that the reasonably foreseeable test is measured solely by the subjective beliefs of the debtor. That is wrong. Cases relied up on by Defendants make clear that the "reasonably foreseeable" test for unreasonably small capital is an objective one. *See*

23

*Moody*, 971 F.2d at 1073 ("Because projections tend to be optimistic, their reasonableness must

be tested by an objective standard . . . ."); *Peltz v. Hatten*, 279 B.R. 710, 744 (D. Del. 2002),

*aff'd sub nom. In re USN Communications, Inc.*, 60 F. App'x 401 (3d Cir. 2003) ("Determining

whether a firm has unreasonably small capital requires an objective assessment of the

companies' financial projections.").

The Defendants do not argue that SemGroup's management's projections were

reasonable and showed SemGroup had adequate capital.  The Defendants provide no evidence

they ever reviewed a set of projections, and their solvency expert testified he never reviewed a

set of projections.  *See* Ex. 7 (Lederman Dep. at 196:2-4).  Rather, the Defendants' expert merely

assumed as correct the summary projections contained in the June 2008 Goldman Sachs'

preliminary valuation.  *See id.* at 196:7-23.  But those assumptions are highly questionable at

best.  *See* Ex. 1 (Reiss Report at ¶¶ 159-60) ("SemGroup's projections "[did] not provide

detailed assumptions with which to judge their reasonableness," and "there are indications that

suggest that the projections included in the investment bank presentations were based on

incorrect assumptions and/or were not reasonable.").[15]

The Defendants instead rely solely on the assertion that SemGroup, at the time of the

Equity Distributions, had sufficient access to capital because the lenders had not terminated

access to the credit available under the Credit Agreement.  *See* SJ Motion at 16.  The Defendants

then assert that the Court must end the analysis there, and ignore any evidence that SemGroup's

access to capital was entirely based on a faulty factual premise and not grounded in any manner

on SemGroup's economic reality.  *Id.* at 16.  Accordingly, the Defendants' primary legal

argument appears to be that the unreasonable small capital test must be based, not on facts as

---

[15]   Defendants have not sought to exclude Reiss's testimony with respect to the unreasonableness of projections
summarized in preliminary valuations prepared by Goldman Sachs.

they existed, but on facts as the relevant parties subjectively and erroneously perceived them at

the time.  SJ Motion at 15-19.  But this overly simplistic and flawed approach to an adequacy of

capital analysis does not comport with well-established law.

As an initial matter, the parties are in agreement that for purposes of insolvency and

adequacy of capital, the determination of financial condition must be made at the time of the

transfer in question.  *See e.g.*, *Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*, 98 CIV.

3251 (HB), 2000 WL 178278 (S.D.N.Y. Feb. 16, 2000); *Plassein Int'l Corp.* 2008 WL 1990315

at *24.[16]  However, courts in this Circuit and others have universally recognized that,

notwithstanding this general proposition, "to assure that a valuation is based in reality, the court

may consider information originating subsequent to the [valuation] date if it tends to shed light

on a fair and accurate assessment of the asset or liability as of the pertinent date."  *Union Bank*,

2000 WL 178278, at *10 (internal quotations omitted).

In this regard, it is well established in both the insolvency and unreasonably small capital

context that when examining a company's financial condition  "it is not improper hindsight for a

court to attribute 'current circumstances' which may be more correctly defined as 'current

awareness' or 'current discovery' of the existence of a previous set of circumstances."  *In re*

*Coated Sales, Inc.*, 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992).  This "current discovery"

principle has been applied in a variety of contexts, including evaluating a company's financial

condition for purposes of a fraudulent transfer claim, to examine the economic reality of a

company at a given point in time where relevant facts and circumstances that existed at that time

are only later discovered.  *See, e.g., In re Mama D. Angelo, Inc.*, 55 F.3d 552, 556-57 (10th Cir.

1995) (applying the "current discovery" principle in holding that construction defects and other

---

[16]    Many of Defendants' cases in their Summary Judgment Motion stand for nothing more than this bare
proposition, which Plaintiff does not contest in any event.  *See Kipperman v. Onex Corp.*, 411 B.R. 805, 837 (N.D.
Ga. 2009); *In re EBC I, Inc.*, 380 B.R. 348 (D. Del. 2008); *Ferrari v. Barclays Bus. Credit, Inc.* (*In re Morse Tool,
Inc.*), 148 B.R. 97, 133 (Bankr. D. Mass. 1992).

25

problems that existed on the transfer date and were only later discovered should be considered in determining the debtor's financial condition as of the transfer date).

The "current discovery" principle is particularly suited to application in the unreasonably small capital context, because, as noted above, the test is forward looking, based on reasonable foreseeability, and must be grounded in the reality of the company's financial condition, not its perceived performance.  It is proper for a party to submit evidence of the reasonableness of hypotheticals and assumptions because, as explained above, projections are based on assumptions and hypotheticals.  In *Plassein*, in denying summary judgment, the court credited the expert opinion of the plaintiff's expert, who explained that assuming reasonable deviations "from management's forecasts had significant impact on [Plassein's] ability to avoid defaulting on its debt obligations."  *Plassein*, 2008 WL 1990315 at *9.  The management's projections at issue  assumed suppliers would provide discounts even though no such agreements being in place at the time of the challenged transfer.  *Id.*

Thus, for example, a company that is obtaining access to capital based on a false premise cannot reasonably project that it will maintain access to that capital going forward.  Consider the two extreme hypotheticals – a ponzi scheme or a company that has cash available to operate but solely because all of the funds the company's bank account resulted from theft by the CEO.  In either circumstance, the company may have capital, but it is laughable to say either could expect to continue to have access to capital.  *See e.g.*, *Emerson v. Maples* (*In re Mark Benskin & Co., Inc.*), 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993) ("[T]he fact that the debtor operated primarily if not exclusively on fraudulently obtained funds establishes that the debtor had little if any legitimate operating capital.  It would seem axiomatic that the debtor was operating its business with unreasonably small capital.").  Under Defendants' interpretation of the unreasonably small capital test, a company's operating capital is adequate, regardless of whether

that capital was obtained illegally, comes from an improper source, or was borrowed under false pretenses.   Simply put, that cannot be the law.

In contrast, the "current discovery" principle further reinforces the validity of the Trustee's claim in this case.   For example, in *Coated Sales*, the company's officers engaged in a massive business-wide fraud, which existed at the time of the transfer in question but was only later discovered.  *Coated Sales, Inc.*, 144 B.R. at 666-68.  The plaintiff sought to recover loans as preferences payments  that occurred prior to the discovery of the fraud.  *Id.* at 666.  The court confirmed that "[t]he finding of false accounts receivable, nonexistent inventory and illegal transfers must be taken into account in accurately determining CSI's financial condition at the transfer date," and held that <u>"[i]f known, the fact that CSI was never the superior company it portrayed itself as undoubtedly would have restricted the financial assistance it otherwise received</u>."  *Id.* at 668 (emphasis added).  Though *Coated Sales* involved an insolvency claim, in this context the facts as they existed (but were unknown) are relevant to both types of constructive fraudulent transfers – unknown, but existing facts, impact both value and the reasonableness of projected economic performance as of the transfer date.  *See In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 111-12 (Bankr. S.D.N.Y. 1999), *aff'd,* 263 B.R. 406 (S.D.N.Y. 2001) (court granted summary judgment in favor of trustee on solvency and unreasonably small capital claims; because debtor was out of regulatory compliance on the transaction date and securities regulators "would have closed Hanover down on that date had it known of the broker's true financial condition" it was proper to disregard posted prices for transferred stock and use a subsequent date).

Here, as in *Coated Sales*, it does not matter why the lenders, counterparties and rating agencies mistakenly believed Kivisto's trading was not backed by physical inventory.  Rather, there is a factual issue that is both material and, at the very least, disputed, that they did hold

such beliefs.[17]  And thus, like *Coated Sales*, those false perceptions must be considered in taking into account SemGroup's access to credit, the reasonableness of its financial projections, and thus its adequacy of capital.

In *Iridium*, a case heavily relied upon by the Defendants,[18] the court similarly recognized that solvency and adequacy of capital is determined at the time of the transfer, and recognized the "current discovery" principle, quoting the exact language in *Coated Sales*.  The court held that, in the context of determining solvency and adequacy of capital, "it is not improper hindsight for a court to attribute 'current circumstances' which may be more correctly defined as 'current awareness' or 'current discovery' of the existence of a previous set of circumstances."  *In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) ) (quoting *Coated Sales*, 144 B.R. at 668).  In applying the "current discovery" principle, however, the court concluded that "[t]he [plaintiff] has failed to show that there was concealment of relevant circumstances at the time of the transfers or that there was a subsequent discovery of such circumstances that must be taken into account when determining Iridium's value."  *Id.* at 346.  But what the court found was factually lacking in *Iridium* is precisely what the Trustee has adduced in this case – that the relevant parties were not aware of pertinent and material circumstances at the time of the transfers and that the subsequent discovery of such circumstances must be taken into account in determining SemGroup's financial condition at the time of the Equity Distributions, including its projections and access to credit.

*Iridium* also provides the perfect example of the Defendants' straw-man argument.  In *Iridium*, the court rejected the argument that Iridium's ultimate failure *four years* after the

---

[17]  Defendants make a half-hearted attempt at showing that the lenders had the information necessary to know that Kivisto was engaged in the sale of naked trading – trading not backed by physical inventory.  As set forth herein, that issue is disputed.  Moreover, whether the lenders should have known or could have done an analysis to know of the speculative trading is not at issue – what is important is whether the Lenders did in fact know (which they did not).

[18]  *See e.g.*, SJ Motion at 16.

transfer in question was indicative of Iridium's value at the time of the transfer. Such a stand-alone assertion is improper hindsight. Here, on the other hand, what is relevant to Plaintiff's argument on unreasonably small capital is not the perfect hindsight of SemGroup's ultimate failure, but instead, the fact that *at the time of the Equity Distributions*, SemGroup had a different economic reality than the relevant parties perceived. That is precisely the "current circumstances" or "current discovery" that courts have universally held is not improper hindsight.

The term "hindsight" refers to an unforeseen event that could not have been taken into account in reasonable projections at the time of the transfer in question. *See e.g.*, *Moody*, 971 F.2d at 1074-75 ("But we cannot say the district court erred in finding that the *drastic decline in sales was unforeseeable* as of the date of the leveraged buyout.") (emphasis added).

But that is not the case here. In this case, trading activity resulting in the sale of naked options and the non-arms-length Westback related party transaction were prohibited at the time of the Equity Distributions, but had in fact occurred. Any projections grounded in SemGroup's actual performance and economic reality (as required by the Third Circuit) would need to take into account, as reasonably foreseeable, that the lenders would cut off SemGroup's access to credit based on this trading activity, the Westback transaction, and the resulting debt covenant violations that were occurring, but not known, at the time of the Equity Distributions. Put another way, the only reasonable projections SemGroup could prepare would be those that assumed zero probability of future access to capital under the Credit Agreement. ██████

████████████████████████████████████████████████████

███████████████████████████

Indeed, in one case relied upon by the Defendants, the court found that the debtor's projections were unreasonable because they did not take into account certain reasonably

foreseeable events, including the possible increase in labor costs or a strike that may result from the possible need to renegotiate collective bargaining agreements. *See Ferrari v. Barclays Bus. Credit, Inc.* (*In re Morse Tool, Inc.*), 148 B.R. 97, 126 (Bankr. D. Mass. 1992). The Defendants cannot argue that SemGroup's reasonable projections at the time of the Equity Distributions should assume continued access and reliance on credit from the lenders obtained under false pretenses.

The Defendants' reliance on *In re Edgewater Medical Center,* 373 B.R. 845 (N.D. Ill. 2007), is misplaced.[19] In *Edgewater*, the court purported to distinguish *Coated Sales* on the ground that the debtor in *Coated Sales* was "actually insolvent" and "only appeared to be solvent because it was 'cooking the books.'" *Edgewater*, 373 B.R. at 854. Thus, the court in *Edgewater* erroneously reasoned that, unlike in *Coated Sales*, the court would have to engage in speculation to determine what would have happened to the debtor's financial condition if the Medicare fraud had been uncovered. *Id.* at 854-55. This analysis fails to recognize that, as described above, the court in *Coated Sales* was not applying the "current discovery" principle to determine asset values as compared with values on allegedly "cooked books," but instead to examine what the debtor's financial condition (or value) would be if all of the relevant facts and circumstances that existed at the time of the transfers were known. *See Coated Sales*, 144 B.R. at 668 (holding that the company's true financial condition, "if not concealed, would have undoubtedly had an effect on asset values . . . .").[20]

---

[19]   *Edgewater* was decided after a five week trial where plaintiff's expert witnesses testified with respect to its theories, not on a summary judgment motion with a related motion to exclude expert testimony on the pertinent issues. *Id.* at 850.

[20]   In other words, the court's inquiry in *Coated Sales* was not whether the asset values were different simply because they were falsely accounted for, but rather that such values would have been effected by mere knowledge of the company's true nature at the time of the transfer. *See Id.* at 668 (holding that, if known that the company was "never the superior company it portrayed itself as," then access to financial assistance (credit) would have been restricted). Indeed, the court stated that "fair market value presumes that all relevant information is known by seller and buyer" and thus held that, in determining the fair market value of the company, the court would assume that any

Such application of the accepted "current discovery" principle leads to the *Coated Sales*' conclusion that, based on the actual facts and circumstances at the time of the transfer had those facts and circumstances been known, the company's access to credit would have been circumscribed. That is precisely the Trustee's argument in this case. Plaintiff has provided substantial evidence that, had the true nature of SemGroup's issues been known at the Equity Distribution dates, SemGroup's access to credit would have been cut off and thus it was inadequately capitalized. Insofar as *Edgewater* does not even discuss the "current discovery" principle, it offers no guidance in this case.

### B.    Whether SemGroup had Unreasonably Small Capital Turns on Disputed Questions of Material Fact

For the reasons set forth above, the Trustee's unreasonably small capital theory is valid as a matter of law. For purposes of the SJ Motion, the unreasonably small capital claim turns on whether there are at least disputed issues of material fact that: (1) SemGroup had unreasonably small capital if it lost access to borrowings under the Credit Agreement because it could not find replacement financing fast enough; (2) SemGroup's lenders erroneously believed Kivisto was not engaged in unauthorized trading or entering into transactions with affiliates that were precluded (*i.e.* the belief that SemGroup was not in material default under the Credit Agreement); (3) as of both Equity Distribution dates, SemGroup was in default under the Credit Agreement by, among other things, the non-arm's length related party transactions with Westback and Kivisto engaging in trading activity that was not backed by physical inventory; and (4) had SemGroup's lenders known of such defaults, they would not have waived such defaults, would have terminated access to credit, and would not have permitted the Equity Distributions to occur.

---

purchaser was aware of "a massive business-wide fraud and environmental contamination; otherwise, that party would be the victim of fraud." *Id.*

With respect to point 1, at minimum there are disputed facts. ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

As set forth below, points 2, 3 and 4 – whether SemGroup's lenders erroneously believed that SemGroup was not in material default of the Credit Agreement, whether SemGroup was in fact in default under the Credit Agreement, and whether SemGroup's lenders would have terminated access to credit if all relevant information was known to them – all involve disputes of material fact.  Facts, §§ C, D, and F.  Because the Trust has provided admissible evidence of such facts, the SJ Motion must be denied.

> **1.      Whether the Lenders Erroneously Believed that SemGroup was not in Material Default of the Credit Agreement involves a Disputed Issue of Material Fact**

There is at least a dispute as to whether the Lenders knew of the speculative trading or the terms of the Westback transactions, all in violation of the Credit Agreement.  On this point, the Trust is entitled to proceed to trial.

SemGroup's management repeatedly represented that it did not engage in speculative trading in the form of the sale of "naked options" and that the trading occurring at SemGroup was for hedging purposes and was backed by physical inventory and/or offsetting positions.  Numerous contemporaneous internal documents from the lenders under the Credit Agreement

show that those lenders believed SemGroup's management's representations.  *See* Statement of Facts § C.



　　　　To avoid these facts, the Defendants assert that the lenders received information sufficient to inform that the trading activity involved positions that were not backed by physical inventory or other offsetting positions, but that is a disputed issue of fact.[23]  There is substantial evidence that the lenders were unaware, and relied on SemGroup's management's

---



21

[22]　*See, e.g.*, Ex. 29 (Cottonwood Petition at ¶ 46 ("As early as 2005, Kivisto had embarked on a trading strategy that carried significant risks to the viability of the Company. This trading strategy was completely unknown to Plaintiffs. In fact, Kivisto represented to Plaintiffs on repeated occasions that SemGroup's trading positions were always "delta neutral" and that SemGroup "closed its positions in its trading books every day."); Examiner's Report at 49 ("[Thane] Ritchie did not recall reviewing [the RMP] prior to investing, because he was told that all SemGroup trading was hedged against physical inventory.")).

[23]　The Defendants entirely ignore the Westback transactions, focusing solely on the speculative trading.  But SemGroup extending an interest-free loan to Westback is as much a material default under the Credit Agreement as the speculative trading directed by Kivisto.

representations regarding the trading activity.[24]  There is evidence that the lenders were taken by surprise when the nature of the trading was disclosed in mid-July 2008.  There is evidence that the lenders never saw SemGroup's trading book, and would not have been able to determine the nature of the trading in the manner that Dr. Bergin did after obtaining access to the trading book.

Further, the standard of care of the lenders to engage in forensic analysis of their borrowers is not on trial in this case, and the issue is whether the lenders in fact knew of the speculative trading and the Westback transactions, not whether the lenders could have possibly decided to ignore SemGroup's management's representations and take it upon themselves to act as "forensic accountants" to cobble together documents to attempt to determine whether Kivisto was engaged in speculative trading.[25]



█████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

**2.      Whether SemGroup was in Default under the Credit Agreement
Involves a Disputed Issue of Material Fact**

As discussed above, the Credit Agreement prohibits (i) speculative trading not offset by
inventory or future positions both directly and indirectly by incorporation of SemGroup's RMP
and (ii) certain transactions with affiliates.  *See* Statement of Facts, at §§ C, F.

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████

Similarly, there is substantial evidence that SemGroup was providing interest-free credit to Westback relating to Westback's trading activities and that SemGroup's lenders and counterparties were unaware of these transactions.  *See* Statement of Facts, at § F.  The Trust has presented evidence that the Westback transactions violated the Credit Agreement.

The Defendants do not address in either the SJ Motion or the MIL the proper interpretation of the Credit Agreement and its prohibitions or whether SemGroup's trading violated the Credit Agreement.  The Defendants cannot dispute that, at the very least, a disputed issue of material fact as to SemGroup's transactions with Westback and the lenders' knowledge of those transactions.  Thus, the issue of whether SemGroup was in fact engaged in activities that constituted defaults under the Credit Agreement cannot be decided on summary judgment.

### 3.    Whether SemGroup's Lenders Would have Cut Off its Access to Capital is a Disputed Issue of Material Fact

The Defendants spend most of their efforts on the issue of whether SemGroup's lenders would have declared a default under the Credit Agreement, and refused to extend credit, if they had known of the nature of the trading activity at SemGroup and SemGroup's transactions with Westback.

██████████████████████████████████████

██████████████████████████████████████

████████████ ─

        ████████████████████████████████

██████████████████████████████████████

███████████████████████████████    The Defendants' reliance on

the Third Circuit's decision in *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir.

1980), for this proposition is misguided.  In *Teen-Ed* the Third Circuit held that a company's

accountant could testify as a lay witness on the company's lost profits to prove damages.  *Id.* at

404.  The Third Circuit discussed the permissible scope of lay opinion as set forth in the Federal

Rules of Evidence, stating that "[a] lay witness in a federal court proceeding is permitted under

Fed. R. Evid. 701 to offer an opinion on the basis of relevant historical or narrative facts that the

witness has perceived."  *Id.*  The Third Circuit further stated that this "perception" requirement

"simply reflects a recognition of the limitation . . . that a witness must have 'personal knowledge

of the matter' in order to testify to it."  *Id.*  The Third Circuit noted that unlike a lay witness, an

expert may answer "hypothetical questions."  *Id.*

        Indeed, across a broad spectrum of legal issues, courts routinely permit percipient

witnesses to testify as to what such witnesses *would have done* had the witnesses known certain

facts.  *See, e.g. In re Sanders*, 110 B.R. 328, 331 (M.D. Tenn. 1989) ("[Bank President] also

specifically testified that the bank would not have extended any credit or renewal of credit if the

inaccuracies of the financial statement had been known. This is sufficient proof of reliance.");

*Craycroft v. Carlton*, 322 S.W.3d 587, 590 (Mo. Ct. App. 2010) (buyer of home testified that he

---

[26]  The Defendants have asserted in their motions *in limine* ("MIL") that the testimony of Mr. Reiss and Mr.
Layman should be excluded.  Plaintiff addresses this argument in the opposition to MIL filed concurrently herewith.

and his wife "would not have bought the house, or not at that price, had they known its water history and that of adjacent areas.  The trial court was entitled to believe this testimony, especially when Buyers had to spend large sums to clean up and remedy their water problems."); In re White, 167 B.R. 977, 980 (Bankr. E.D. Okla. 1994) (finding reasonable reliance where "[t]he Vice President of Red Oak Branch testified that had he known that the other debts existed, he would not have loaned the Debtors the money.")

████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

The Defendants make a last-ditch effort to  assert that any evidence from the lenders under the Credit Agreement is "self-serving and unreliable."  SJ Motion at 21.  Putting aside Plaintiff's disagreement with the Defendants' characterization of evidence from the lenders, this is not an issue that is relevant for summary judgment.  This would go to the credibility of

witnesses or fact testimony and the Defendants will have an opportunity at trial to test that

credibility. *Dickerson v. U.S. Steel Corp.*, 439 F. Supp. 55, 62 (E.D. Pa. 1977) ("The Court, in

considering such a motion, may not resolve issues of credibility or fact; if material fact issues are

in dispute, summary judgment is not appropriate.").

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████  ████████████████████████

     Accordingly, because Plaintiff has offered both expert opinion (which, as set forth in

Section II below, is admissible) and other factual evidence, there is a disputed issue of material

fact and summary judgment is not appropriate.

---

<sup>27</sup> ████████████████████████████████████████████████

████████████████████████████████████████████████████

## CONCLUSION

Based on the foregoing facts and legal arguments, Plaintiff respectfully requests that this Court deny the SJ Motion.

Dated:   March 8, 2013

BLANK ROME LLP

/s/ David A. Dorey
Bonnie Glantz Fatell (No. 3809)
David A. Dorey (No. 5283)
1201 Market Street, Ste. 800
Wilmington, Delaware 19801
Telephone:  (302) 425-6400
Facsimile:  (302) 425-6464

-and-

QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
R. Brian Timmons
Eric D. Winston
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

*Counsel for Plaintiff Bettina M. Whyte, Trustee of the SemGroup Litigation Trust*