# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**SemCrude, L.P.,** *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 08-11525 (BLS)<br><br>(Jointly Administered) |
| **Bettina M. Whyte, as the Trustee, on behalf of the SemGroup Litigation Trust,**<br><br>    Plaintiff,<br><br>v.<br><br>**C/R Energy Coinvestment II, L.P., C/R SemGroup Investment Partnership, L.P., Ritchie SG Holdings LLC, SGLP Holding, Ltd., SGLP US Holding, LLC and Doe Defendants, 1-100,**<br><br>    Defendants. | Adv. No. 10-50840<br><br><br>Related to Adv. Docket Nos. 72, 77, 81, 236, & 237 |
| **Bettina M. Whyte, as the Trustee, on behalf of the SemGroup Litigation Trust,**<br>    Plaintiff,<br><br>v.<br><br>**Cottonwood Partnership, LLP, Rosene Family, L.L.C., Satco Investments, L.L.C., and Doe Defendants, 1-100,**<br><br>    Defendants. | Adv. No. 10-51808<br><br>Related to Adv. Docket Nos. 87, 90, 215, & 216 |

BLANK ROME LLP
Bonnie Glantz Fatell, Esq.
David A. Dorey, Esq.
1201 Market Street
Wilmington, DE 19801

-and-

QUINN EMANUEL
URQUHART & SULLIVAN,
LLP
R. Brian Timmons, Esq.
Eric D. Winston, Esq.
Matthew Scheck, Esq.
Brian Collins, Esq.
Rachel Appleton, Esq.
865 South Figueroa Street
Los Angeles, CA 90017

*Counsel for Plaintiff Bettina M.
Whyte, Trustee of the SemGroup
Litigation Trust*

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD,
P.A.
Patrick J. Reilley, Esq.
Sanjay Bhatnagar, Esq.
500 Delaware Avenue
Wilmington, DE 19801

-and-

SIDLEY AUSTIN LLP
Thomas K. Cauley, Jr., Esq.
Brian A. McAleenan, Esq.
One South Dearborn Street
Chicago, IL 60603

*Counsel for Defendants
Ritchie SG Holdings, L.L.C.,
Ritchie SGLP Holding, Ltd.,
and SGLP US Holding,
L.L.C.*

LOIZIDES, P.A.
Laurie S. Polleck, Esq.
1225 King Street
Wilmington, DE 19801

-and-

ALBRIGHT, RUSHER &
HARDCASTLE, PC
James W. Rusher, Esq.
15 West Sixth Street
Tusla, OK 74119

*Counsel for Defendant
Cottonwood Partnership, LLP*

# OPINION[1]

Before the Court are constructive fraudulent transfer claims pursuant to § 548 and § 544 of the Bankruptcy Code, and § 116 and § 117 of Oklahoma's UFTA[2] (collectively, the "Claims") filed by the Plaintiff, Bettina M. Whyte, as trustee of the SemGroup Litigation Trust (the "Trustee").  The two transfers at issue here involve the Debtors' distributions to Defendants Ritchie and Cottonwood in February of 2008.[3]  The Trustee filed her Complaint alleging that the Debtors received no value in exchange for the 2008 Distributions to the Defendants and that the Debtors were insolvent at the time of the 2008 Distributions.  In response, the Defendants argue that the Debtors were solvent at the time of the 2008 Distributions and thus, the transfers cannot be avoided.  For the reasons that follow, the Court finds that the Trustee has failed to carry her burden to prove that the Debtors were insolvent at the time of the 2008 Distributions.  Accordingly, the Court will enter judgment in favor of the Defendants.

## I. BACKGROUND

### A. The Debtors

On July 22, 2008 (the "Petition Date"), SemGroup, L.P. and certain of its affiliates (collectively, the "Debtors")[4] filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure.  *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] Capitalized terms used in this introduction are defined *infra*.

[3] As noted below, prior to the trial on the merits, the Court disposed of the Trustee's constructive fraudulent transfer claims for the 2007 Distributions by granting partial summary judgment on the theory of unreasonably small capital.  *See* Adv. Docket No. 231.  All references to the Adversary Docket refer to Adv. No. 10-50840 unless otherwise indicated.

[4] The Debtors in this case are SemGroup, L.P. (hereinafter, "SemGroup"), SemCrude, L.P., Chemical Petroleum Exchange, Incorporated, Eaglwing, L.P., Grayson Pipeline, L.L.C., Greyhawk Gas Storage Company, L.L.C., K.C. Asphalt L.L.C., SemCanada II, L.P., SemCanada L.P., SemCrude Pipeline, L.L.C., SemFuel Transport LLC, SemFuel, L.P., SemGas Gathering LLC, SemGas Storage, L.L.C., SemGas, L.P., SemGroup Asia, L.L.C., SemGroup Finance Corp., , SemKan, L.L.C., SemManagement, L.L.C., SemMaterials Vietnam, L.L.C., SemMaterials, L.P., SemOperating G.P., L.L.C., SemStream, L.P., SemTrucking, L.P. and Steuben Development Company, L.L.C.

District of Delaware.  On October 28, 2009, the Court entered an order (the "Confirmation Order")[5] confirming the Debtors' fourth amended joint plan of reorganization (the "Plan"),[6] which became effective on November 20, 2009.  The Plan and the Confirmation Order provide for the creation of a litigation trust (the "SemGroup Litigation Trust") and have vested it with certain litigation claims belonging to the Debtors' estates, including the claims that form the basis of these adversary proceedings.  Bettina M. Whyte has been designated the trustee of the SemGroup Litigation Trust.

As of the Petition Date, the Debtors were engaged in a number of different business segments in the energy industry.  The Debtors' primary business was in providing midstream oil and gas services, moving petroleum products and natural gas via trucks and a network of pipelines, and storing these products in Oklahoma and elsewhere.  The Debtors consolidated revenues for the 2007 fiscal year totaled approximately $13.2 billion.

In addition to their physical purchasing and selling of petroleum products and natural gas, the Debtors had a substantial marketing business, which consisted of purchasing and reselling physical product and other producer services.  As part of this marketing business, the Debtors also traded in derivatives on both the New York Mercantile Exchange ("NYMEX") and the over-the-counter ("OTC") markets.  As discussed in exhaustive detail below, the Debtors' prepetition trading activities ultimately gave rise to a severe liquidity crisis and triggered the Debtors' bankruptcy.

## B. These Adversary Proceedings

On March 29, 2010, the Trustee filed a complaint (the "Complaint"), which was subsequently amended,[7] against the Defendants, Ritchie SG Holdings LLC, SGLP Holdings, Ltd., SGLP US Holding, LLC (collectively, "Ritchie") and Cottonwood Partnership, LLP ("Cottonwood").  By the Complaint, the Trustee seeks to avoid and recover certain SemGroup partnership distributions that occurred on or around August 2, 2007 (the "2007 Distributions") and February 20, 2008

---

[5] Docket No. 6347.

[6] Docket No. 6329.

[7] Adv. Docket No. 39.  The Complaint was amended a second time [Adv. Docket No. 77].  The Trustee's complaint against Defendant Cottonwood was also amended twice.  *See* Adv. No. 10-51808, Docket Nos. 3 & 87.  Subsequent references to the Complaint in this Opinion are references to the second amended complaints.

(the "2008 Distributions") (collectively, the "Distributions").    The Defendants owned equity interests in SemGroup and its general partner, SemGroup G.P., LLC.    When SemGroup made equity distributions, the Defendants received a portion of the proceeds due to their ownership interest.  The 2007 Distributions totaled $26,192,686.92.[8] The 2008 Distributions, at issue here, totaled $29,102,985.45.[9]  The eight-count Complaint asserts constructive fraudulent transfer claims pursuant § 548, § 544, Oklahoma's Uniform Fraudulent Transfer Act ("UFTA"), and recovery of the alleged fraudulent transfers under § 550 of the Bankruptcy Code.

On September 17, 2010, Defendant Ritchie filed a motion to dismiss the adversary proceeding.[10]  The Defendants argued that the Trustee failed to adequately allege that the Debtors were insolvent, or were left with unreasonably small capital when the Distributions were made.  The motion was fully briefed and argued by the parties. Thereafter, the Court issued a Memorandum Order denying Defendants' motion to dismiss.[11]  The Court found that the Trustee sufficiently alleged the Debtors' insolvency during the relevant period, by making adjustments to the Debtors' balance sheet.  The Court noted that "[w]hether the Plaintiff will be able to sufficiently substantiate its adjustments is a question for the trier of fact and is not appropriate at this stage in the proceeding."[12]

By certification of counsel, Defendant Ritchie filed a joint stipulation ("Joint Stipulation") of the parties to consolidate these two adversary proceedings for discovery purposes because the Trustee's complaints are nearly identical in terms of factual allegations and legal

---

[8] SemGroup made limited partnership and general partnership distributions to Ritchie and Cottonwood totaling $23,389,807.65 and $2,802,879.27, respectively.  *See* Compl. ¶ 76 [Adv. Docket No. 77]; Compl. ¶ 78 [Adv. No. 10-51808, Adv. Docket No. 87].  The 2007 Distributions are not the subject of this Opinion.

[9] SemGroup made limited partnership and general partnership distributions to Ritchie and Cottonwood totaling $25,988,675.17 and $3,114,310.28, respectively.  *See* Ans. ¶ 74 [Adv. Docket No. 72]; Ans. ¶ 78 [Adv. No. 10-51808, Docket No. 90].

[10] To be precise, C/R Energy Coinvestment II, L.P. and C/R SemGroup Investment Partnership, L.P. filed the motion to dismiss [Adv. Docket No. 42], and Defendant Ritchie joined the motion.  *See* Adv. Docket No. 46.

[11] Adv. Docket No. 69.

[12] Memorandum Order ¶ 18.

issues.[13]  The Joint Stipulation stated that the Trustee's "claims in both cases rest on contentions that SemGroup was insolvent and had unreasonably small capital at the time of the transfers."[14]  The Joint Stipulation also stated that consolidation "will minimize the burden on the parties and the third parties and avoid needless duplication of effort and expense for all involved."[15]  The Court approved the Joint Stipulation by Order dated December 16, 2011.[16]

Thereafter, the parties commenced with discovery into the Trustee's two main contentions: insolvency and unreasonably small capital around the time of the Distributions.  Discovery consisted of multiple expert reports based on the Debtors' audited and unaudited financial statements, credit agreements, borrowing base reports, and third-party financial reports.  It also consisted of depositions of the parties and the proposed expert witnesses, among others.

## C. Partial Summary Judgment as to the 2007 Distributions

After discovery concluded, the Trustee was only able to allege that the Debtors had "unreasonably small capital" at the time of the 2007 Distributions, and could not allege insolvency.  On February 19, 2013, the Defendants moved for partial summary judgment (the "Partial MSJ") on the constructive fraudulent transfer claims relating to the 2007 Distributions under the Trustee's unreasonably small capital theory.[17]  The Defendants argued that the Debtors had access to a substantial credit facility provided by a syndicate of over 100 different lenders.  This availability was more than sufficient to meet the Debtors' capital requirements in 2007, so the Defendants contend that the Trustee's unreasonably small capital argument must fail.[18]  More specifically, the Defendants argue that the Trustee's capitalization analysis was based entirely on speculation as to how the lenders would have reacted if they had known about the Debtors' alleged speculative trading.

---

[13] Adv. Docket No. 84.

[14] Joint Stipulation ¶ 2.

[15] *Id.* ¶ 4.

[16] Adv. Docket No. 85.  On March 22, 2013, the Court also issued a letter ruling consolidating these adversary proceedings for trial.  *See* Adv. Docket No. 210.

[17] Adv. Docket No. 172.  For purposes of the Partial MSJ, the Court will only reference Defendant Ritchie's submissions because Defendant Cottonwood's materials were substantially similar.

[18] Adv. Docket No. 173.

The Trustee opposed the Defendants' Partial MSJ contending that the unreasonably small capital argument was based on actual facts that existed at the time of the 2007 Distributions, and not mere speculation.[19]  Specifically, the Trustee alleged that SemGroup's CEO, Thomas Kivisto, was engaged in speculative derivatives trading, which was prohibited by restrictive covenants contained in SemGroup's loan agreements.  Additionally, the Trustee alleged that the Debtors were funneling millions of dollars to Westback Purchasing Company, L.L.C. ("Westback"), a company owned by Kivisto, so that he could engage in his own commodities trading.  These two occurrences, the Trustee contends, were unknown by the Debtors' lenders; disclosure of these circumstances, the Trustee reasons, would have led the lenders to terminate the credit facility, leaving the Debtors with unreasonably small capital.

On April 10, 2013, the Court heard argument on the Partial MSJ regarding the Trustee's unreasonably small capital theory.  By an extensive oral ruling on April 11, 2013, the Court granted the Partial MSJ relating to the 2007 Distributions.[20]  The Court held that, in the Third Circuit, courts consider all available sources of capital, including bank lines, when determining whether a company is adequately capitalized.  Thus, it was not seriously disputed that the Debtors were adequately capitalized and had sufficient liquidity to operate in 2007.  The Court declined to accept the Trustee's argument for applying the "current circumstances doctrine" because that doctrine is used primarily in the context of fraud, and there is no allegation of fraud or criminal conduct by the Debtors in this case.[21]

### D. The 2008 Distributions

On April 22, 2013, the Court held a three-day trial on the sole issue of the Debtors' solvency at the time of the 2008 Distributions.  At the outset, the Court heard argument on pending pre-trial motions.  The Court denied the motion *in limine* to exclude an expert report and

---

[19] Adv. Docket No. 181.

[20] Hr'g Tr. 5:13-18, April 11, 2013 [Adv. Docket No. 231].  In connection therewith, the Court also granted certain motions *in limine* relating to evidence or testimony to have been presented at trial in support of the Trustee's unreasonably small capital argument.

[21] *See id.* at 7:7-13.  "There is a temptation…to use hindsight to establish whether a debtor was adequately capitalized, and I think that's a temptation to be avoided, because it would improperly expand fraudulent conveyance law far beyond its proper borders."  *Id.* at 8:15-19.

certain pleadings filed by Defendant Cottonwood in two separate lawsuits (the "Cottonwood Materials"). The Court also denied the motion *in limine* to exclude the Defendants' expert report on solvency, and the Court denied the motion to strike testimony of Robert Valbona. With the preliminary issues resolved, the Court heard testimony from M. Freddie Reiss, the Trustee's solvency expert, Robert Valbona, a corporate banking advisor to the Debtors, Dr. Richard Bergin, the Trustee's commodities trading expert, Joseph Graham, Defendants' commodities trading expert, Michael Lederman, Defendants' solvency expert, and Gary Adams, Cottonwood's general manager. The well-developed record reflects lay and expert testimony to which all witnesses testified credibly. The matter has been fully briefed and tried, and is ripe for decision.

## II. THE PARTIES' POSITIONS

The Trustee first argues that the Debtors received no value for the 2008 Distributions because they were equity distributions.[22] The Trustee next argues that the Debtors were insolvent at the time of the 2008 Distributions. Supported by her solvency expert's analysis, the Trustee utilizes the Asset Approach to valuing a company, which the Trustee argues is the only reliable approach given the circumstances of the case. Reiss made adjustments to the Debtors' balance sheet to value the Debtors as a going concern. One adjustment was reducing the value of the Westback Receivable from $263.4 million to zero. The Trustee argues that an informed buyer would have given little to no value for the Westback Receivable in February 2008. Further, Reiss testified that no adjustments needed to be made to the balance sheet liability "Minority Interest" nor "Goodwill." The Trustee concludes that at the time of the 2008 Distributions, the Debtors were insolvent by approximately $429 million.

The Defendants argue that the proper approaches to value the Debtors are either the Income Approach or Market Approach because the Debtors were a going concern at the time of the 2008 Distributions. The Defendants' solvency expert used Goldman's June 2008 valuation as a starting point and made a number of adjustments to it. Lederman

---

[22] Defendant Ritchie concedes this argument, but Defendant Cottonwood contends that the Debtors received reasonably equivalent value when they made the 2008 Distributions because SemGroup enjoyed tax benefits of being a limited partnership. Cottonwood argues that SemGroup's partnership agreement required them to make distributions of 45% of its gains to the partners for the partners to pay taxes.

increased the value of "construction-in-progress" by $206 million, adjusted for the difference in market multiples applicable from February 2008 to June 2008, and reduced the valuation to account for the risk of loss from the Debtors' derivatives trading. The Defendants concluded that at the time of the 2008 Distributions, the Debtors had a solvency cushion of between $670 million and $2.7 billion.

## III. JURISDICTION & VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), (b)(1), and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O).

## IV. LEGAL ANALYSIS

### A. Constructive Fraudulent Transfer

Section 548(a)(1) provides, in pertinent part, that:

> The trustee may avoid any transfer…of an interest of the debtor in property, or any obligation…incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation….

11 U.S.C. § 548(a)(1).[23]   To recover under § 548, the Trustee has the burden of proving by a preponderance of the evidence that (1) the transfer at issue occurred within two years before the date of the filing of the bankruptcy petition; (2) "reasonably equivalent value" was not provided to the debtor in exchange for the transfer at issue; and (3) the debtor was insolvent on the date of the transfer or became insolvent because of the transfer.  *See* 11 U.S.C. § 548(a)(1)(B); *Peltz v. Hatten*, 279 B.R. 710, 735 (D. Del. 2002) *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003).

The Court can dispose of the first two elements in summary fashion.  First, it is undisputed that the 2008 Distributions fall within the two-year period.  The Petition Date was July 22, 2008.  Second, for the "reasonably equivalent value" prong, Defendant Cottonwood

---

[23] There is no allegation of an actual fraudulent transfer under § 548(a)(1)(A).

argues that SemGroup received value on account of its status as a limited partnership because its taxes passed through to the limited partners.[24]  In response, the Trustee contends that no value is conferred in equity distributions.  The Court agrees with the Trustee.  The Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor…."  11 U.S.C. § 548(d)(2)(A).  Case law teaches that equity distributions on account of partnership interests do not confer "value" upon the transferor.  *See, e.g., Hayes v. Palm Seedlings Partners (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 540 (9th Cir. 1990) ("The partnership distributions here were not for value because Palms Seedlings–A made the distributions on account of the partnership interests and not on account of debt or property transferred to the partnership in exchange for the distribution.").  It is undisputed that the 2008 Distributions were made on account of Defendants' equity interests in SemGroup, and no debt or property was transferred to the Debtors in exchange for the Distributions.  The Court finds that no reasonably equivalent value was provided to the Debtors for the 2008 Distributions.  Thus, the key point of contention in this case is whether the Trustee can carry her burden to prove the Debtors' insolvency at the time of the 2008 Distributions.

## B. Solvency Analysis

To succeed on a fraudulent transfer claim, the Trustee must prove by a preponderance of the evidence that the Debtors were insolvent as of the date of the 2008 Distributions, or were rendered insolvent by the 2008 Distributions.  *Peltz*, 279 B.R. at 735.  The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation…."  11 U.S.C. § 101(32)(A).  "In determining a 'fair valuation' of the entity's assets, an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis."  *Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages Co.)*, 367 B.R. 500, 508 (Bankr. D. Del. 2007); *see also Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998) (holding that the first question a court must ask in arriving at a "fair valuation" is whether to value assets on a liquidation or going concern basis).  The entity should be valued as a going concern unless liquidation in bankruptcy was "clearly imminent" on the date of the transfer.  *In re Trans World*

---

[24] The Court notes that Defendant Ritchie does not dispute the "reasonably equivalent value" prong of the analysis.

*Airlines, Inc.*, 134 F.3d at 193. "Before the going concern valuation is to be abandoned, the business must be 'wholly inoperative, defunct or dead on its feet.'" *In re Am. Classic Voyages, Co.*, 367 B.R. at 508 (quoting *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd., Inc.)*, 93 B.R. 333, 341 (E.D. Pa. 1988)).

The parties generally agree that the Debtors should be valued on a going concern basis. Defendants' expert, Lederman, opined that the Debtors were operating as a going concern at the time of the 2008 Distributions.[25] He noted that the Debtors were not ultimately liquidated in bankruptcy, but were instead reorganized as an operational company, and the Debtors' investment bankers, during the bankruptcy, incorporated "goodwill" in their going concern valuation of the company.[26] The Trustee's valuation expert, Reiss, also concluded that the Debtors should be valued on a going concern basis.[27] The Court agrees. At the time of the 2008 Distribution, SemGroup was a fully functioning business with plans to continue operations as usual. *See Lids Corp. v. Marathon Inv. Partners (In re Lids Corp.)*, 281 B.R. 535, 541 (Bankr. D. Del. 2002) (holding that Lids was not clearly on the verge of liquidation on the valuation date). The record reflects that there was no indication in February 2008 that a bankruptcy filing was "clearly imminent." *In re Trans World Airlines, Inc.*, 134 F.3d at 193. Thus, the Court concludes that the Debtors should be valued on a going concern basis.

## C. Valuation Methodologies

After determining that the Debtors should be valued as a going concern, the Court must next determine the Debtors' "fair value." The Third Circuit has stated that "a fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time." *Id.* at 194. "Assets should be valued at the sale price a willing and prudent seller would accept from a willing and prudent buyer if the assets were offered in a fair market for a reasonable period of time." *In re Lids Corp.*, 281 B.R. at 541. Generally, courts use a "balance sheet test" for insolvency, which compares assets to debts. *See Peltz v. Hatten*, 279 B.R. 710, 743 (D. Del. 2002) (citation omitted). "[I]t is appropriate to adjust

---

[25] *See* App. in Support of Opp'ns to Defs.' Mot. for Partial Summ. J. and Mot. *in Limine* to Exclude Expert Test. of R. Bruce Layman and M. Freddie Reiss, Ex. 6 (the "Lederman Report") at 11 [Adv. Docket No. 172].

[26] *See id.*

[27] *See* Reiss Decl. ¶ 12 (stating that he "valued SemGroup as a going-concern, rather than on a liquidation basis").

items on the balance sheet that are shown at a higher or lower value than their going concern value and to examine whether assets of a company that are not found on its balance sheet should be included in its fair value." *Id.*

The parties' experts agree that three standard approaches are used to value a company: the Income Approach, the Market Approach, and the Asset Based Approach.[28]   Under the Income Approach, the discounted cash flow method is used to estimate the business' value.[29] After determining value, adjustments are made to account for the company being valued on a going concern.   Then liabilities are subtracted to produce either a net solvency or net insolvency determination.   Under the Market Approach, "net revenues and earnings are multiplied by an appropriate range of risk-adjusted multiples to determine the company's total enterprise value." *In re Lids Corp.*, 281 B.R. at 543 ("The Market Multiple Methodology is an acceptable technique for determining solvency.") (citations omitted). The parties' experts agree that this approach typically compares valuation metrics like EBITDA[30] from similar companies, usually in the same industry, or precedent transactions from comparable companies.[31] Finally, the Asset Based Approach revalues at fair value each of the individual balance sheet line items on a company's balance sheet.[32]

The parties' experts further agree that the Income Approach is the preferred method to value a company on a going concern basis.[33] The Defendants' expert adopted both the Income Approach and Market Approach for valuing the Debtors.  He stated that the Asset Approach "is unsuitable for capturing the goodwill and going concern values that commonly result in an enterprise being worth more than it would be as

---

[28] *See* Lederman Report 11; App. in Support of Opp'ns to Defs.' Mot. for Partial Summ. J. and Mot. in *Limine* to Exclude Expert Test. of R. Bruce Layman and M. Freddie Reiss, Ex. 1 (the "Reiss Report") ¶ 108 [Adv. Docket No. 172].

[29] Lederman Report 12.

[30] Earnings Before Interest, Taxes, Depreciation, and Amortization.

[31] Lederman Report 12; Reiss Report ¶¶ 170-71.

[32] Reiss Report ¶ 109.

[33] *See* Lederman Report 11 ("Because the 'going concern' premise applies to the SemGroup valuation, the Income Approach and the Market Approach are superior to the Asset Approach."); Reiss Report ¶ 109 ("[I]n typical valuations the Income Approach is preferred."); *Id.* ¶ 154 ("The Income Approach is a common valuation methodology for the typical company, and is an approach I have used for other engagements.").

a mere assemblage of assets."[34]  Using the Income Approach, Lederman concluded that the Debtors had a solvency cushion ranging between $670 million and $2.683 billion as of December 31, 2007.[35]  The Trustee's expert used the Asset Based Approach because it is "the only approach that can adequately take into account the impact of Kivisto's speculative trading and the conduct associated with Westback."[36]  Using the Asset Based Approach, Reiss concluded that the Debtors were insolvent by at least $428.9 million as of January 31, 2008.[37]

### 1.  Trustee's Expert Valuation

Reiss started with a valuation date of January 31, 2008 and analyzed SemGroup's consolidated financial statements for the year of 2007 and the unaudited financial statements for January 2008.[38]  Using the Asset Based Approach, he made several adjustments to the balance sheet line items.  First, Reiss decreased the Westback Receivable from $263.4 million to zero because "it was very unlikely that SemGroup would collect the amounts owed by Westback."[39]  Reiss then increased the book value of "pipeline linefill" by $46.8 million because it is recorded on the financial statements at historical cost.[40]  Next, Reiss reduced the value of the debt issuance balance from $28 million to zero because "there is no value of this 'asset' to a third party, as the asset only reflects the costs that the company had previously paid."[41]  The last adjustment Reiss made was to reduce "investment in affiliates"

---

[34] Lederman Report 11.

[35] *Id.* at 21 & Ex. D ("Chart 5" and the "Balance Sheet Test," respectively).

[36] Reiss Report ¶ 109.  Reiss opines that the Asset Based Approach "is typically used when management at the subject company has engaged in activity that is contrary to the company's stated business purpose or when fundamental assumptions about the company's business turn out to be incorrect."  *Id.*

[37] *Id.* ¶ 138.

[38] *Id.* ¶¶ 110-12.

[39] *Id.* ¶ 115.  Reiss discusses the general lack of documentation for the Westback Receivables and lackluster collection effort by SemGroup to support his allegation.  *See id.* ¶¶ 116-23.

[40] Reiss Report ¶ 128.

[41] *Id.* ¶ 130.  Reiss explains that "debt issuance cost" reflects the upfront costs a company pays when issuing debt and it is capitalized as an asset on the company's balance sheet and amortized over the life of the debt issued.  *Id.* ¶ 129.

down by $13.5 million to account for the sale of Niska Gas Storage ("Niska").[42]

Reiss also concluded that the assets on the balance sheet already took into consideration any "goodwill," and therefore no adjustment was necessary.[43] He reached a similar conclusion with "customer relationships," which is "an intangible asset created through the acquisition of a business."[44] Citing Kivisto's speculative trading and significant unrealized losses, Reiss concluded that although making downward adjustments to these line items is appropriate, it was not necessary for the report.[45]

The rest of Reiss' solvency analysis analyzed the limitations with using the Income Approach and Market Approach. Reiss concluded that the primary limitation of the Income Approach was "the lack of reliable, detailed financial projections and corresponding assumptions with which to create a discounted cash flow ("DCF") valuation."[46] He noted that Goldman's valuation uses the DCF method derived from financial projections, but Goldman does not provide the assumptions that it used, so Reiss could not judge their reasonableness.[47] Reiss further opined that Goldman's valuation was based on the incorrect premise that the Debtors were not involved in speculative trading, and therefore cannot be relied upon now.[48]

Reiss stated that the primary limitation to the Market Approach is that "SemGroup's risk profile was materially different from other midstream companies, and therefore no comparable companies existed with which to obtain a transaction multiple."[49] Reiss also concluded that the Debtors had a negative EBITDA throughout the relevant period, which would lead to a negative fair valuation if used.[50] He noted that Goldman used an "Adjusted EBITDA" figure as a multiple metric, but that metric would be inappropriate to use given significant

---

[42] *Id.* ¶ 136.

[43] *Id.* ¶ 144. "Goodwill reflects the amount a purchase price exceeds the fair value of a target's identifiable tangible and intangible assets…." *Id.*

[44] *Id.* ¶ 146.

[45] *Id.* ¶ 152.

[46] Reiss Report ¶ 156.

[47] *Id.* ¶ 159.

[48] *Id.* ¶ 163. Reiss also stated that the Debtors were not a typical company in the industry due to Kivisto's speculative trading, so choosing a discount rate based on comparable companies would be inappropriate. *Id.* ¶ 167.

[49] *Id.* ¶ 171.

[50] *Id.* ¶ 172.

unrealized derivative losses and the incorrect assumption that the Debtors' trading was fully backed by physical inventory.[51]   For these reasons, Reiss concluded that only the Asset Based Approach is appropriate to value the Debtors, which resulted in a determination that they were insolvent by at least $429 million.

## 2.  Defendants' Expert Valuation

Lederman chose SemGroup's balance sheet from December 31, 2007 set forth in the BDO Seidman, LLP report dated April 30, 2009 for his valuation analysis.[52]   Lederman relied principally on Goldman's June 2008 valuation of the Debtors.   His reasoning for relying on Goldman's valuation was that it is close in time to the 2008 Distributions, Goldman valued the Debtors on a going concern basis using both the Income and Market approaches, and Goldman had substantial access to the Debtors' due diligence materials including projections and access to management.[53]  Further, Lederman stated that Goldman's valuation was prepared in the context of an actual 144A securities offering, and thus was more reliable.[54]   Lederman defended his reliance on the Goldman valuation by stating that "Goldman's valuation is easily adjusted…for any negative economic impact that SemGroup's trading activities may have had on the Company's value and its solvency cushion."[55]

Goldman's valuation reported the Debtors' value ranged from $4.3-$6.1 billion.  Lederman then adjusted those values to account for market multiples from February to June, which increased the value by $384-$543 million.   He also increased the value by $206 million to account for "construction-in-progress," which he stated would have value to a buyer above the value in Goldman's analysis because Goldman's valuation was for a securities offering as opposed to a mergers and acquisitions transaction.[56]   Lederman decreased the Debtors' value by $14 million to account for the sale of Niska.  He then subtracted "Net Long Term Debt" from the Debtors' adjusted value to arrive at "Net Equity," which ranged from $3-5 billion.   Finally,

---

[51] Reiss Report ¶¶ 173-74.

[52] Lederman Report 12.

[53] *Id.* at 16.

[54] *Id.* at 16-17.   Lederman acknowledged that this transaction was never completed, but stated that there is no indication that it was not completed due to a valuation disagreement.  *Id.* at 17.

[55] *Id.*

[56] *Id.* at 18 n.45.

Lederman subtracted all other balance sheet liabilities (a total of $2.228 billion) and $143 million, which represented "Net Trade Book Deficiency," from Net Equity to arrive at a solvency cushion ranging from $670 million to $2.683 billion.

Graham, the Defendants' trading expert, calculated the Net Trade Book Deficiency of $143 million to account for any negative economic impact of the Debtors' trading activities.[57]  Graham's methodology of valuing the Debtors' trade book was to first determine the payment the Debtors would have to make if they novated their trade book.[58]  He calculated this amount to be approximately $1.971 billion.  Graham then calculated the corresponding margin payments that the Debtors would receive if they novated their trade book, which equaled approximately $1.973 billion.  Since the amount the Debtors would have paid and received are almost the same—in fact a slightly net positive position—Graham treated it as a wash.  Lastly, Graham calculated how much the Debtors would have to pay as a risk premium for novating their trade book.  He determined that $143 million was a conservative risk premium for the Debtors to pay.[59]  Graham stated that when SemGroup novated its trade book in July 2008, SemGroup paid Barclays a total premium of $143 million, and this amount was based on six to seven volatility points, which he deemed to be excessive.[60]

The rest of Lederman's report criticized Reiss' utilization of the Asset Based Approach in his valuation.  Lederman disagreed with his lack of adjusting "goodwill" for fair value by drawing a distinction

---

[57] The Debtors' trade book consisted of futures and options positions on both the NYMEX and OTC markets.  *See* App. in Support of Opp'ns to Defs.' Mot. for Partial Summ. J. and Mot. *in Limine* to Exclude Expert Test. of R. Bruce Layman and M. Freddie Reiss, Ex. 8 (the "Graham Report") at 17 [Adv. Docket No. 172].  Kivisto employed the "short straddle" and "short strangle" trading strategies, which has a potential for unlimited loss and only limited gain if the underlying securities experience little volatility.  *Id.* at 5.

[58] *See id.* at 20.  Novating the trade book essentially liquidates all of the Debtors' derivative positions into an amount that, based on whether the positions are "in the money" or "out of the money," the Debtors would either receive, or have to pay.  *See id.* at 17.  Graham also concluded that he sees no reason why the Debtors could not have novated their trade book in February 2008 at a market-priced volatility premium.  *Id.* at 16.

[59] *See id.* at 21.

[60] Graham stated that Barclays charged $23 million per volatility point, and in his experience, he has "never seen a novation that included a premium as high as six volatility points."  Graham Report 23 n.31.

between book value according to accounting principles and value. Lederman also disagreed with eliminating the Westback Receivables from the balance sheet. Lederman relied on Graham who noted that the Westback Receivables were not a credit risk as of March 2008 because Westback made payments totaling $102.4 million in January and February of 2008.[61] Without hindsight, Graham explained that the Westback Receivables were not impaired, let alone totally uncollectible.[62] Finally, Lederman stated that "Minority Interest," listed as a liability on the balance sheet in the amount of $320.3 million, is not a liability because it represents the value of the equity ownership of minority shareholders and should be eliminated from the balance sheet.[63] Thus, even under Reiss' approach, if Lederman makes the adjustments he believes to be appropriate, the Debtors are still solvent by $182.82 to 249.62 million.[64]

### D. The Income Approach

Upon review of the Lederman Report and the Reiss Report, the Court finds that Lederman's approach is more convincing under the circumstances. The Court first notes that the parties agree, and the Court finds, that the Debtors should be valued on a going concern basis as it was a functioning company at the time of the 2008 Distributions and it was not "clearly imminent" that SemGroup would file bankruptcy or liquidate. *In re Trans World Airlines, Inc.*, 134 F.3d at 193. Second, the parties agree, and the Court finds, that for a company valued as a going concern, the preferred approach is the Income Approach.[65] Although "there is no single method for assessing solvency or assigning a value to assets and liabilities for the purpose of determining solvency," *In re Comm. Fin. Servs., Inc.*, 350 B.R. 520, 535 (Bankr. N.D. Okla. 2005), the Court finds that in this case, the Income Approach is the best approach.

The Court is not convinced by the Trustee's arguments against adopting the Income Approach in this case. Reiss' main contention with the Income Approach was a lack of reliable financial projections

---

[61] *Id.* at 24.

[62] *Id.*

[63] *Id.* at 25.

[64] *Id.* at 26-27. Lederman also disagrees with Reiss' refusal to use an Adjusted EBITDA under the Market Approach because "unrealized derivative losses did not affect SemGroup's EBITDA." *Id.* at 22.

[65] *See supra* note 33 and accompanying text.

and corresponding assumptions.[66]  Although neither expert had access to the Debtors' financial projections and assumptions, or their management, Lederman utilized Goldman's valuation, which the Court finds sufficiently reliable.  Goldman's valuation was contemporaneously prepared in 2008 and thus, not made in anticipation of litigation.  *In re Iridium Operating LLC*, 373 B.R. at 348 (disregarding a valuation made for the purpose of litigation and stating that courts recognize that "'[a] powerful indication of contemporary, informed opinion as to value' comes from private investors who '[w]ith their finances and time at stake, and with access to substantial professional expertise, [ ] concluded at the time [ ]that the business was indeed one that could be profitably pursued'") (citation omitted).  Further, the valuation was done in connection with a 144A securities offering, and therefore, the record indicates that Goldman did significant due diligence in preparing its analysis.  Goldman's due diligence consisted of frequent conversations with SemGroup's management, access to a data room containing documents posted since SemGroup's credit agreement was originally drafted in 2005, and "due diligence sessions" with SemGroup's management through 2008.[67]  The Court is satisfied that Lederman's reliance on Goldman's valuation as a starting point is appropriate because it was a contemporaneous valuation made for an actual securities offering in which Goldman did significant due diligence.

Reiss also contends that the Income Approach, based on Goldman's valuation, cannot accurately value the Debtors because Goldman did not know about the Debtors' speculative trading or account for it in their valuation.[68]  However, the Court is satisfied that

---

[66] *See* Reiss Report ¶ 156.

[67] *See* Goldman Confidential Commitments Committee Memo 2-3, May 22, 2008, PTX 176.004-5.

[68] The parties agree that the Debtors' "Enhanced Marketing Strategy" resulted in selling short strangle and short straddle positions.  *See* Graham Report 9-11; Bergin Report 5.  The parties also appear to agree that the Debtors' trading was speculative, but disagree about its effect on the Debtors.  The Trustee's trading expert opined that the Debtors' trading activity resulted in selling "naked" calls and puts that were not backed by either inventory or offsetting positions.  *See* Bergin Report 33.  Bergin stated that this strategy was contrary to the Debtors' Risk Management Policy and was incomparable to other similar companies.  *Id.* at 40.  Graham acknowledged that the Debtors' trading activity was not fully backed by physical oil or offsetting positions, but instead opined that the Debtors' lenders had sufficient information to

any effect of unknown speculative trading is adequately quantified and adjusted for in Lederman's valuation, which adopted Graham's analysis. Graham calculated the value of the trade book by novation, *i.e.*, how much it would cost the Debtors if they sold their entire trade book in February 2008 to a third party. His analysis calculated the negative net value of the trade book, and then offset it by margin payments that the Debtors would receive. This equaled approximately zero. The only other calculation necessary for novating the Debtors' trade book was to account for a liquidity premium, *i.e.*, a premium that a third party would have demanded to account for the risk of price movement over time on the derivative positions. Graham opined that $143 million would be a conservative premium for the Debtors to pay.[69] Although the Trustee contends otherwise, the Court finds no reason why the Debtors could not have novated their trade book in February 2008, similar to how it accomplished it in July 2008.

## E. The Asset Approach

The Court is not convinced that the Asset Approach is the best way to value the Debtors for a few reasons. The parties agreed that for a company valued as a going concern, the Asset Approach was not the best approach. Even under the Asset Approach, the Court questions whether valuing the Westback Receivables at zero was proper. The Court acknowledges the insider nature of these transactions,[70] but it cannot be said that this receivable was completely uncollectible because of a lack of formal documentation and Kivisto's ownership of

---

ascertain this fact and it was an approved trading strategy. *See* Graham Report 13 & 15. Although the trading activity may have been contrary to the Debtors' Risk Management Policy, the Court notes that there is no allegation of wrongdoing or fraud through the Debtors' trading activities. In fact, the Trustee's expert testified that "[Kivisto] would be a legend" if the price of crude oil stabilized and stayed within a narrow range per his trading strategy. Bergin Dep. 132:4-19, Jan. 31, 2013. Thus, it is hard for the Court to deem Goldman's contemporaneous valuation wholly unreliable without using hindsight.

[69] *See* Graham Report 20-25. Graham noted that $143 million was the risk premium that SemGroup paid Barclays in July 2008 when it novated its trade book. He opined that $143 million did not reflect fair market value in July, and would not reflect fair value in February, suggesting that fair value was less. *Id.* at 21-23.

[70] Westback was wholly owned by Kivisto, SemGroup's CEO, and the distributions made by SemGroup were used by Westback for trading activities.

Westback.  It is undisputed that, in January and February of 2008, Westback made payments in the amount of $102.4 million.  Thus, the Court doubts the accuracy of decreasing the Debtors' value by the full amount of the Westback Receivables—$263.4 million—which accounts for a significant portion of Reiss' insolvency valuation; he concluded that the Debtors were insolvent by $429 million.  Finally, as previously noted, the Trustee bears the burden to prove insolvency by a preponderance of the evidence.[71]  *See Peltz v. Hatten*, 279 B.R. 710, 735 (D. Del. 2002).  In consideration of the testimony and reports of all the experts, the record reflects that the Trustee did not carry her burden to prove that the Debtors were insolvent when they made the 2008 Distributions.  Therefore, the Court rules in favor of the Defendants on fraudulent transfer claims for the 2008 Distributions.

## F.  Claims under § 544(b) and Oklahoma's UFTA

The Trustee has alleged that the 2008 Distributions are also voidable under § 544 of the Bankruptcy Code and § 117(A) of Oklahoma's UFTA.  Under § 544(b), a debtor may avoid any transfer of an interest in the debtor's property that is voidable under applicable law by a creditor holding an allowable unsecured claim.  11 U.S.C. § 544(b)(1).  Under Oklahoma's UFTA,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Okla. Stat. Ann. tit. 24, § 117(A) (2008); *see also id.* § 116(A) (similar fraudulent transfer statute).  Both Oklahoma statutes require a debtor to be insolvent at the time of the transfer.  Because the Trustee has not carried her burden to prove the Debtors' insolvency at the time of the

---

[71] The Court notes that a solvency analysis under § 548 differs from a § 547 analysis in that the debtor is presumed to have been insolvent under § 547, whereas under § 548, the Trustee does not enjoy this presumption.  *Compare* 11 U.S.C. § 547(f) *with* 11 U.S.C. § 548(a)(1); *See also In re Am. Classic Voyages Co.*, 367 B.R. 500, 507 (Bankr. D. Del. 2007).

2008 Distributions, the Court rules in favor of the Defendants on these claims as well.[72]

# V. CONCLUSION

For the foregoing reasons, the Court finds that the Trustee failed to carry her burden to prove insolvency at the time of the 2008 Distributions.  Judgment is entered in favor of the Defendants on all counts.  An appropriate Order follows.


**BY THE COURT**:

Dated: June 10, 2013
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[72] The claim for recovery under § 550 must also fail because the Court rules that the 2008 Distributions were not constructive fraudulent transfers and are thus, not avoidable.  Section 550 does not contain an independent basis for recovery.  *See* 11 U.S.C. § 550.