IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| SEMCRUDE, L.P., et al., ) | Chapter 11 |
| ) | Bank. No. 08-11525 (BLS) |
| Debtors. ) | |
| ) | |
| BETTINA M. WHYTE, on behalf of the ) | |
| SemGroup Litigation Trust, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | Civ. No. 13-1375-SLR |
| ) | |
| RITCHIE SG HOLDINGS LLC, et al., ) | |
| ) | |
| Appellees. ) | |
| ) | |
| BETTINA M. WHYTE, on behalf of the ) | |
| SemGroup Litigation Trust, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | Civ. No. 13-1376-SLR |
| ) | |
| COTTONWOOD PARTNERSHIP, LLP, ) | |
| et al., ) | |
| ) | |
| Appellees. ) | |

**MEMORANDUM**

At Wilmington this 30th day of September, 2014, having reviewed the papers filed in connection with the above captioned bankruptcy appeal, I will affirm the decisions of the bankruptcy court for the reasons that follow:

1. **Procedural background.** These are consolidated appeals arising from the

bankruptcy court's denial of appellant's claims seeking to avoid two equity distributions totaling more than $55 million that SemGroup, L.P. ("SemGroup") and its general partner, SemGroup G.P., L.L.C., made to Ritchie SG Holdings, L.L.C., SGLP Holding, Ltd., and SGLP US Holding, L.L.C. (collectively, "Ritchie") in August 2007 ("the 2007 distribution") and February 2008 ("the 2008 distribution"). Appellant seeks to avoid the distributions as constructively fraudulent transfers based on two theories: (1) SemGroup was left with unreasonably small capital after both distributions; and (2) SemGroup was insolvent on the date of the 2008 distribution. The bankruptcy court denied the unreasonably small capital claim on summary judgment[1] and the insolvency claim after trial.

2. **Factual background.** The following facts of record are undisputed, as far as I can discern. SemGroup was a "midstream" energy company that provided transportation, storage, and distribution of oil and gas products to oil producers and refiners. It had assets including pipelines, gathering systems, processing plants, storage facilities, and terminals. SemGroup was the fifth-largest privately held company in the United States.

3. SemGroup depended on credit facilities for capital. In this regard, more than 100 different lenders formed a syndicate (the "Bank Group") that provided SemGroup

---

[1] Although the bankruptcy court's grant of summary judgment was directed to the 2007 distribution, appellant elected not to pursue an unreasonably small capital argument with respect to the 2008 distribution at trial. Therefore, the parties have apparently extended the bankruptcy court's reasoning to the 2008 distribution for purposes of this appeal.

with a line of credit from 2005 through July 2008.[2] Bank of America, which led the Bank Group, extended a small portion of the total credit to SemGroup. Each lender was individually responsible for deciding whether to extend credit to SemGroup. SemGroup had actual bank loans and actual lines of credit at all relevant times.

4. In connection with its business, SemGroup traded options on oil-based commodities, using a trading strategy that, while potentially highly profitable, was inconsistent with both its risk management policy[3] and Article VII of the Credit Agreement.[4] In addition to selling naked options, SemGroup made advances to fund trading losses incurred by Westback Purchasing Company, L.L.C., a company owned by SemGroup's CEO and his wife, without charging any interest, securing collateral, or executing contracts requiring repayment (hereafter, "Westback payments").

5. Based on its ownership of approximately 25% of the limited partnership interest in SemGroup, Ritchie received $22.9 million in the 2007 distribution and $25.4 million in the 2008 distribution. Between July 2007 and February 2008, however, oil prices were volatile, and SemGroup had to post large margin deposits on the options it sold, which forced SemGroup to increase its borrowing under the Credit Agreement from about $800 million to over $1.7 billion. In July 2008, the Bank Group declared SemGroup in default of the Credit Agreement, leading SemGroup to file for bankruptcy

---

[2]The arrangement was memorialized in an "Amended and Restated Credit Agreement" ("Credit Agreement") dated as of October 18, 2005. (Civ. No. 13-1375, D.I. 19, ex. 2)

[3]Civ. No. 13-1375, D.I. 19, ex. 1.

[4]To wit, its trades were neither offset by other trades nor backed by physical inventory and, hence, known as "naked" options.

on July 22, 2008. There is no evidence of record that the Bank Group declared a default because of SemGroup's options trading or the Westback payments. There are no allegations that SemGroup concealed its activities or engaged in fraud.

6. **Standard of review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101–02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. *In re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d Cir. 2002).

7. **Unreasonably small capital claims.** The leading case dealing with such claims is *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992). According to the Third Circuit in *Moody*, "unreasonably small capital denotes a financial condition short of equitable insolvency." *Id.* at 1070. The Court recognized that

4

"'capital' is a term of art" referring generally to "'[a]ccumulated goods, possessions, and assets, used for the production of profits and wealth.'" *Id.* (citation omitted). The Third Circuit went on to reason that,

> [v]iewed in this light, an "unreasonably small capital" would refer to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency.

*Id.*

8. The Court concluded that "the test for unreasonably small capital is reasonable foreseeability. Under this analysis, it was proper for the district court to consider availability of credit in determining whether[, in this case, the debtor,] was left with an unreasonably small capital. The critical question is whether the parties' projections were reasonable." *Id.* at 1073. The "reasonableness" of the projections "must be tested by an objective standard anchored in the company's actual performance. . . . However, reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error." *Id.* To "strike a proper balance" under the "reasonable foreseeability" test, the Third Circuit directed courts to "take[] into account that 'businesses fail for all sorts of reasons, and that fraudulent [conveyance] laws are not a panacea for all such failures.'" *Id. (*citation omitted).

9. The above reasoning has been subsequently interpreted by various courts. For instance, citing to *Moody*, the Seventh Circuit has explained that

5

> [t]he difference between insolvency and "unreasonably small" assets in the LBO context is the difference between being bankrupt on the day the LBO is consummated and having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable.
>
> [In this regard, cautioned the Court, o]ne has to be careful with a term like "unreasonably small." It is fuzzy, and in danger of being interpreted under the influence of hindsight bias. One is tempted to suppose that because a firm failed it must have been inadequately capitalized. The temptation must be resisted. . . .

*Boyer v. Crown Stock Distributions, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009). According to the bankruptcy court in *In re Kane & Kane*, 2013 WL 1197609 (Bankr. S.D. Fla. Mar. 25, 2013), "there must be a causal relationship between the [fraudulent transfers] and the likelihood that the Debtor's business will fail. . . . A debtor's later failure, alone, is not dispositive on this issue. The Court's analysis must be done as of the time of the transfers in question." *Id.* at *10 (citing to *Moody*). *See also In re Tronox*, 503 B.R. 239, 320 (Bankr. S.D.N.Y. 2013) ( "'[U]nreasonably small capital' means 'difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future.'") (citation omitted); *In re WRT Energy Corp.*, 282 B.R. 343, 411 (Bankr. W.D. La. 2001).

10. Admittedly, none of the above cited cases addresses facts similar to those at bar. Nevertheless, in the absence of case law directly on point, the reasoning employed in these cases is a useful guide for analysis. In the first instance, there can be no dispute that, consistent with *Moody*, it is proper to consider availability of credit in determining whether a company has been left with an unreasonably small capital after a distribution. There also can be no dispute that, at the time of the two distributions at issue, SemGroup had a substantial line of credit. Appellant maintains in this regard that

6

she at least raised a genuine issue of material fact sufficient to withstand summary judgment as to "whether it was reasonably foreseeable that SemGroup would be unable to sustain its operations due to its massive breach of the Credit Agreement" and the likely termination of the credit facility provided thereunder. (D.I. 18 at 10)

11. It is not clear from the record whether or not the Bank Group was aware of the business activities identified by appellant as being inconsistent with SemGroup's obligations under the Credit Agreement.[5]  As recognized by the bankruptcy court, however, it makes no difference.  If the Bank Group was aware of such, appellant's position collapses on itself, for there is no forecast to make - SemGroup's access to credit had not been withdrawn at the time of either of the distributions despite the "massive" breach of the Credit Agreement.  If the Bank Group was not aware of such activities, one has to engage in multiple levels of forecasting in order to embrace appellant's position.  More specifically, in the cases relied on by the parties, the courts had the benefit of historical data and of a company's financial projections going forward, the question under *Moody* being whether such future projections were reasonable at the time of the event in question (generally a distribution or LBO).  Here, appellant would have the court, in effect, forecast (1) the lenders' reaction to discovering the conduct, and then (2) the consequences of that reaction, i.e., that the only option chosen by all of the lenders would have been to foreclose access to all credit, which (3) had the reasonably foreseeable consequence of bankruptcy.

12. I agree with the bankruptcy court that what appellant proposes is a

---

[5]That is, SemGroup sold naked options and made the Westback payments. (*See, e.g.,* D.I. 18 at 10-11 and the record citations identified therein)

"speculative exercise" not rooted in the case law. I, therefore, affirm the entry of summary judgment in favor of appellees as to the unreasonably small capital claims.

13. **Insolvency claim.** At trial, appellant claimed that the 2008 distribution was a fraudulent transfer because SemGroup was insolvent at the time. The bankruptcy court rejected this claim, and appellant now argues that the court committed error is finding SemGroup solvent in 2008.

14. Even though it was appellant's burden to prove insolvency, appellant offers very little insight on appeal into its expert's approach, instead focusing on the "errors" allegedly committed by appellees' expert. In contrast, appellees described that their primary expert ("Lederman")

> employed the Income Approach, which both parties and the Bankruptcy Court agreed was the "best" approach. . . . Lederman made several adjustments to the Goldman Valuation, which placed SemGroup's value at between $4.25 billion and $6.1 billion in June 2008 and adjusted to account for the February 2008 date of the 2008 Distribution. . . . Lederman then reduced that value by SemGroup's debt, as well as the conservative $143 milliion estimate for the cost of novating SemGroup's trading book, and arrived at a solvency cushion of between $670 million and $2.7 billion at the time of the 2008 Distribution. . . . The Bankruptcy Court based its judgment on [appellant's] failure to prove insolvency, but the judgment can also be affirmed based on Lederman's finding that SemGroup was solvent.

(Civ. No. 13-1375, D.I. 23 at 20) (record citations omitted)

15. The record reflects that the parties' respective experts embraced different assumptions and used different methodologies in reaching their opinions. The bankruptcy court found the opinions offered by appellees' experts to be the more credible and persuasive. In this regard, appellant's expert used the Asset Approach to value SemGroup; Lederman used the preferred Income Approach because SemGroup

8

was a going concern at the time of the 2008 distribution. Appellant's expert treated the Westback payments as an unrecoverable receivable ("the Westback receivable); Lederman opined that the Westback receivable was not totally unrecoverable. Appellant's expert rejected the 2008 Goldman Valuation because it did not take into account SemGroup's trading strategies; Lederman (basing his opinion on that of a witness who had experience as an oil derivatives trader) concluded that, because trading was only one aspect of SemGroup's business, all future exposure to losses from SemGroup's trading positions could be eliminated by selling, or "novating," SemGroup's trade book, thus valuing SemGroup's business independently from trading.

16. At trial, judging the credibility and reliability of the witnesses is within the exclusive purview of the trial judge. Given that appellees' experts used the preferred valuation method and presented cogent rationales for their conclusions, I find no error in the bankruptcy court's entry of judgment for appellees on the insolvency claim. An appropriate order shall issue.

United States District Judge